TOWN OF WAKE FOREST v. A. J. MEDLIN.

(Filed 2 July, 1930.)

**Municipal Corporations H b—Ordinances regulating filling stations held constitutional and valid in this case.**

While the operation of a filling station is not a nuisance *per se,* it may become so, and an incorporated town has in the exercise of its police power, C. S., 2673, 2787, the authority to regulate by ordinance the operation of gasoline filling stations within its limits when such power is not exercised arbitrarily or with unjust discrimination in violation of rights guaranteed by the State and Federal Constitutions, and *held:* where the main residential section of an incorporated town is on one side of a railroad track running through its center, and the main business section is on the other side of the track, an ordinance excluding the operation of filling stations in its exclusive residential section is valid, its provisions applying equally to all persons similarly situated, and the ordinance applies to a curb gasoline pump within the excluded area.

APPEAL by defendant from *Johnson, Special Judge,* at February Special Term, 1930, of WAKE.

Civil action to recover penalty for violation of town ordinance.

On 29 January, 1929, the board of commissioners of the town of Wake Forest, pursuant to charter and general statutory authority, duly adopted an ordinance, the pertinent part of which is as follows:

"1. That from and after the first day of February, 1929, it shall be unlawful to erect, build, maintain or operate any station for the sale or distribution of gasoline, kerosene, or any other petroleum products in any part of the town of Wake Forest west of the Seaboard Air Line Railway tracks."

The penalty for violating said ordinance is fixed at $50 for each day such violation shall continue.

For a long time before the adoption of said ordinance, and for a few days after it took effect, the defendant operated a curb pump, or gasoline filling station, and sold gasoline, in that portion of the town affected by said ordinance.

The town of Wake Forest (population between 1,500 and 2,000) is bisected from north to south by the tracks of the Seaboard Air Line Railway. The principal residential section of the town, including Wake Forest College and its various buildings, high school, church and residences, is located on the west side of said tracks. Through this section, thus thickly populated, runs State Highway No. 50, also numbered National Highway No. 1, parallel with the railroad tracks. There are only two mercantile establishments in this section of the town, one of which is owned by the defendant, in connection with which he has heretofore operated his curb pump or filling station.

The business section of the town, containing a number of stores, foundry, cotton-gin, saw-mill, etc., is to be found on the east side of the railroad tracks.

The ordinance recites that ample facilities for gasoline and filling stations are to be found north and south of the town limits and east of the railroad.

From a directed verdict for the plaintiff, on the admitted facts, and judgment for $50 and the costs, the defendant appeals, assigning errors.

*Mills & Mills and Pou & Pou for plaintiff.*
*Clyde A. Douglass and Robert N. Simms for defendant.*

STACY, C. J. All Wake Forest is divided into two parts, in one of which, the business section, east of the railroad, gasoline filling stations are allowed, in the other, the residential section, west of the railroad, gasoline filling stations are not allowed. The case presents the legality

of such division and regulation. We are not now concerned with the validity of the ordinance as it may affect "any other petroleum products."

That the regulation of gasoline filling or gasoline storage stations comes within the police power of the State is freely conceded; and that such power is specifically conferred upon the plaintiff is likewise conceded. C. S., 2673 and 2787; *Burden v. Ahoskie,* 198 N. C., 92; *MacRae v. Fayetteville,* 198 N. C., 54; *Clinton v. Oil Co.,* 193 N. C., 432, 137 S. E., 183; *Bizzell v. Goldsboro,* 192 N. C., 348, 135 S. E., 50; *Cecil v. Toenjes,* 228 N. W. (Iowa), 874.

It is clearly within the police power of the State to regulate the business of operating such stations and to declare that in particular circumstances and in particular localities *(i. e.,* the residential section of a thickly populated town or city) a gasoline filling or gasoline storage station shall be deemed a nuisance in fact and in law, provided this power is not exerted arbitrarily, or with unjust discrimination, so as to infringe upon rights guaranteed by the State and Federal Constitutions. *Reinman v. Little Rock,* 237 U. S., 171. So long as the regulation is not shown to be clearly unreasonable and arbitrary, and operates uniformly on all persons similarly situated, the district itself being selected in the exercise of that reasonable discretion necessarily accorded the law-making power, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the law, within the meaning of the constitutional provisions on the subject. *Slaughter House Cases,* 16 Wall., 36. Perhaps it should be observed that the police power extends, not only to regulations designed to promote the public health, public morals and public safety, but also to those designed to promote the public convenience or the general prosperity. *C. B. & Q. Ry. v. Drainage Commissioners,* 200 U. S., 561, at page 592.

A gasoline filling or gasoline storage station may not be a nuisance *per se,* but it may become such, like a hospital *(Lawrence v. Nissen,* 173 N. C., 359), a livery stable *(S. v. Bass,* 171 N. C., 781), a dance hall *(S. v. VanHook,* 182 N. C., 831), a sawmill *(Barger v. Smith,* 156 N. C., 323), or a poolroom *(Brunswick-Balke Co. v. Mecklenburg,* 181 N. C., 386), because of its location or by reason of the manner in which it is conducted. Oil and gasoline, invariably used and stored in such stations, are so highly inflammable and explosive that they may, and do, increase the danger to fire, no matter how carefully the buildings are constructed and how noncombustible their materials. And although lawful and necessary buildings, they are of such character that regulation of the place of their erection and use comes well within settled

WAKE FOREST v. MEDLIN.

principles relating to the exercise of the police power. "The State is not bound to wait until contagion is communicated from hospital established in the heart of a city; it may prohibit the establishment of such hospital there, because it is likely to spread contagion. So the keeping of dangerous explosives and inflammable substances, and the erection of buildings of combustible materials within the limits of a dense population may be prohibited because of the probability or possibility of public injury." *Walker, J., in Durham v. Cotton Mills,* 141 N. C., p. 636.

Is the ordinance in question void for arbitrariness or unjust discrimination? We think not. It operates on all alike within the territory affected, and all within the prescribed limits are affected by its terms. *S. v. Roberts,* 198 N. C., 70. The town of Wake Forest is naturally separated into business and residential sections by the tracks of the Seaboard Air Line Railway. What was said in *Turner v. New Bern,* 187 N. C., 541, 122 S. E., 469, would seem to be a direct authority for upholding the present ordinance. We are content to rest our decision on the substance of that opinion.

The appropriateness of the proceeding, a civil action by plaintiff to collect the penalty incurred under the ordinance, is not questioned. *S. v. Abernethy,* 190 N. C., 768, 130 S. E., 619.

Affirmed.

CLARKSON, J., dissenting: The uncontradicted testimony in this action was to the effect: That the defendant·built his store building at the present location in 1905, and has ever since that time operated his business at that location, and during all that period has been engaged in the sale of gasoline at said place. He does not operate a filling station or a garage, but only has what is commonly known as a curb filling pump located beside the curb and drawing gasoline from an underground tank, all of the equipment being of the best approved and modern type. During all of the time of his operation there has never been any congestion around his place nor any accident of any kind, nor any interference with traffic or the safety of person or property. There has been no disorder of any kind, and there have been no fumes or odors emitted from the place and nothing unsanitary about it. There has been absolutely no noise attributable to it. During the twenty-five years of operation there has been no fire communicated from the place of business. Immediately across the sidewalk from the curb pump is defendant's brick building in which is operated a dining-room for the service and convenience of tourists and also a small store. The building is largely covered by ivy and is beautified by potted plants and is kept in a clean, sanitary and very attractive condition and is referred to in the evidence

as a place of beauty. The nearest building to the brick building is the defendant's residence, which is a large and modern and handsome building fitted for and used by tourists as a lodging place. The nearest building is a residence across the wide main street and something like 150 feet distant from the gasoline pump. Northwardly from the pump the nearest building is a residence more than 500 feet away.

Dr. Paschall testified in part: "My home is in Wake Forest. I have been teaching at Wake Forest College since 1896. I am a graduate of Wake Forest College, and I have been living in the town of Wake Forest for thirty-three years. I am professor of Greek. I am thoroughly familiar with the town. I am thoroughly familiar with the location of Mr. Medlin's home and place of business. His home and place of business are neat and attractive. There is absolutely nothing that is unsightly. . . . I know that Mr. Medlin has been selling gasoline there for a good many years. I don't know of any accident or injury that ever occurred in connection with his business. There has been no occurrence there subject to criticism. There has been nothing about his place of business to cause congestion of traffic. . . . The college with all its buildings are within the campus area and walled off. None of the college property is interfered with in any way by Mr. Medlin's place. The school children are not interfered with in any way. . . . I have observed absolutely nothing at Mr. Medlin's place of business that was in any way deleterious to health, morals or the welfare of the people of the town of Wake Forest."

Dr. N. Y. Gulley, a witness for defendant, testified in part: "I have been living on Main Street in the town of Wake Forest for thirty-four years. During all that time I have been in charge of the Law Department of Wake Forest College. My residence is the nearest residence on the east side of Main Street to Mr. Medlin's place of business. I live just across the pasture from Mr. John Mills. I am familiar with the location of Mr. Medlin's place. I am familiar with the town generally and use of the highways. I was familiar with the location of Mr. Medlin's place even before he built his store and station. The operation of his place has been in no sense unsightly or objectionable. I have never seen or heard of anything in connection with it that had a tendency to affect the morals or welfare of the town of Wake Forest. I have never seen any congestion of traffic there. There is absolutely nothing to affect the health of the community. I see nothing objectionable to the place at all. There is nothing about the place or the operation of it that interferes with the students of Wake Forest College in any way. There are very few around there at all. The school children do not pass the Medlin place in going to and from school. The school is

located south of the campus. There is nothing that interferes with children attending the public school."

Mr. C. Y. Holding, a witness for defendant, testified, in part: "I pass there frequently, and have from time to time observed his place of business and the manner in which it was conducted. Over this period of years I have not at any time observed anything at or about Mr. Medlin's place of business that would have a deleterious effect upon the morals, health, safety or welfare of the people of the town of Wake Forest. It has a good appearance. Its sanitary condition is good. I have never observed anything unsanitary about it at any time."

Dr. Sol. P. Holding testified in part: "I was raised at Wake Forest. I am practicing physician. I am duly licensed. I am thoroughly familiar with the town of Wake Forest. I have been there for fifty-eight years. I have observed Mr. Medlin's store frequently. As to the matter of appearance, it is the nicest in town. The store is very deep, and is a pretty place. . . . The tank is almost immediately in front of the brick building. . . . I have not observed anything about that place that is at all unsanitary. There is nothing about the place that would affect the health of the community."

Other witnesses testified to the same effect.

Whether or not a given ordinance does constitute a valid exercise of police power is a question not for the lawmaking body, but for the court. "A determination by the Legislature as to what is a proper exercise of the police power is not final and conclusive, however, but is subject to the supervision of the court. For, as has already been stated, the mere assertion by the Legislature that a statute relates to the public health, safety and welfare does not of itself bring such statute within the police power of the State. It is clear that legislative bodies under the guise of police regulations protecting the public welfare cannot arbitrarily pass laws which have no relation to that subject. Whether the police power has been exercised within the proper limitations, whether or not a law is reasonable, whether a particular measure is designed to further some governmental function or to further private gain, and whether an act bears any reasonable relation to the public purpose sought to be accomplished, are all judicial questions. In like manner, the question as to what are subjects for the lawful exercise of police power is a question for judicial determination. Therefore in its last analysis the question of the validity of measures enacted under the police power is one for the court." 6 R. C. L., at pages 241, 242; *McRae v. Fayetteville,* 198 N. C., 51, at p. 56.

Our Court says further in the *McRae case,* at p. 55: "The facts in reference to the reasonableness of ordinances of this kind are subjects of inquiry by the courts to determine the validity. *Board of Health v.*

*Lewis,* 196 N. C., 641; *Standard Oil Co. et al. v. Marysville,* Adv., Op. 445, Supreme Court Report, Vol. 49, p. 430."

"In order to sustain legislation under the police power, the courts must be able to see that its operation tends in some degree to prevent some offense or evil, or to preserve public health, morals, safety and welfare; and if the statute discloses no such purpose and has no real or substantial relation to these objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the court so to adjudge and thereby give effect to the Constitution." 6 R. C. L., sec. 230, pages 242, 243, and notes 12 and 13.

"As to the extent of this power, it is to be observed that a city cannot forbid the pursuit of an occupation in the particular locality or neighborhood merely on the ground that the occupation in question offends the sensibilities or æsthetic taste of the owners of adjacent property, and renders it less desirable for residential purposes and consequently less valuable. The use must be one which constitutes a nuisance in the legal sense, and the regulation must be reasonable." 19 R. C. L., p. 819, in section 123, note 10.

This Court has said, speaking through *Justice Brown,* in the case of *S. v. Whitlock,* 149 N. C., 542, at p. 543, "Æsthetic considerations will not warrant its adoption, but those only which have for their object the safety and welfare of the community. It is conceded to be a fundamental principle under our system of government that the State may require the individual to so manage and use his property that the public health and safety are best conserved. It is to restrict the owner in those uses of his property which he may have as a matter of natural right and make them conform to the safety and welfare of established society that the police power of the State is invoked.

"While this is true, yet it is fundamental law that the owner of land has the right to erect such structures upon it as he may see fit and put his property to any use which may suit his pleasure, provided that in so doing he does not imperil or threaten harm to others. Tiedeman Lim., 439.

"All statutory restrictions of the use of property are imposed upon the theory that they are *necessary* for the safety, health or comfort of the public, but a limitation which is unnecessary and unreasonable cannot be enforced. Although the police power is a broad one, it is not without its limitations, and a *secure* structure upon private property and one which is not *per se* an infringement upon the public safety and is not a nuisance cannot be made one by legislative fiat and then prohibited. *Yates v. Milwaukee,* 10 Wall., 497; 1 Dillon Municipal Corporation, 374."

Again the Court on page 544 says: "Æsthetic considerations are a matter of luxury and indulgence rather than a necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation." *People v. Green,* 83 N. Y. Sup., 460; *Bill Posting Co. v. Atlantic City,* 71 N. J. Law, 73.

The language quoted above from the last mentioned case was cited with approval by this Court in the case of *S. v. Staples,* 157 N. C., 637, 37 L. R. A. (N. S.), 696.

This Court has said in *McRae v. Fayetteville, supra,* at p. 54, that "A gasoline station is not under the law *per se* a hazard. It might be to some an 'eyesore,' but the law does not allow æsthetic taste to control private property, under the guise of police power. Speaking to the subject we find in *City of Sturgeon v. Wabash Railway Co.,* 17 S. W. Rep., 2d series (Mo.), at p. 618, the following: 'The city has no power to declare that to be a nuisance which is not so at common law or by statute.' *Allison v. City of Richmond,* 51 Mo. Appeals, 133; *Carpenter v. Reliance Realty Co.,* 103 Mo. Appeals, 480; 77 S. W., 1004; *St. Louis v. Hertzeberg Packing & Provision Co.,* 141 Mo., 375; 42 S. W., 954; 39 L. R. A., 551; 64 American State Reports, 516; *Crossman v. Galveston,* 112 Tex., 303; 247 S. W., 810; 26 A. L. R., 1210. Even where the general power exists to declare a nuisance, a city cannot declare the place of a single individual to be a nuisance in the absence of a general regulation applicable to all others of the same class. 19 R. C. L., sec. 117. Neither can a city by virtue of the police power alone for purely æsthetic purposes limit the use which a person may make of his property. 19 R. C. L., 140."

"While there are no precise limits to the police power, it is not however without its limitations, since it may not unreasonably invade private rights, or violate those rights which are guaranteed under either Federal or State constitutions. Accordingly it is an established principle that the constitutional guaranty of the right of property protects it not only from confiscation by legislative edicts, but also from any unjustifiable impairment or abridgment of this right." 6 R. C. L., sec. 193, pages 195 to 196, Notes 16, 17 and 18.

"Legislative restrictions upon the use of property can only be imposed upon the assumption that they are necessary for the health, comfort or general welfare of the public; and any law abridging rights to a use of property which does not infringe the rights of others, or limiting the use of property beyond what is necessary to provide for the welfare and general security of the public, cannot be included in the police power of a municipal government." 6 R. C. L., sec. 208, p. 213, text and note 2.

"The Legislature may regulate when regulation will protect, but may not suppress when inhibition will injure the party pursuing the lawful

vocation and proper regulations will prevent injury to others." 6 R.
C. L., sec. 214, p. 214, p. 222, text and note 10.

"In order to sustain legislative interference by virtue of the police
power under either a statute or a municipal ordinance it is necessary
that the act should have some reasonable relation to the subjects in-
cluded in said power, and the law must tend in a degree that is percepti-
ble and clear toward the preservation of the public welfare, or toward
the prevention of some offense or manifest evil, or to the furtherance of
some object within the scope of the police power. The mere assertion by
the Legislature that a statute relates to the public health, safety or
welfare does not in itself bring that statute within the police power of
the State; for there must be obvious and real connection between the
actual provisions of the police regulation and its avowed purpose, and
the regulation adopted must be reasonably adopted to accomplish the
end sought to be attained. One application of the familiar rule that the
validity of an act is to be determined by its practical operation and
effect and not by its title or declared purpose is that a constitutional
right cannot be abridged by legislation under the guise of police regula-
tion; since the Legislature has no power under the guise of police regu-
lation to invade arbitrarily the personal rights and personal liberty of
the individual citizen or arbitrarily to interfere with private business or
impose unusual and unnecessary restrictions upon lawful occupations or
to invade property rights." 6 R. C. L., sec. 227, p. 237, text and notes
1-11, both inclusive.

The section of the ordinance imposing the *penalty* (section 2 imposes
no penalty), is as follows: "That any person, firm, or corporation erect-
ing, building, maintaining, or operating any filling station for the sale
or distribution of gasoline, kerosene, or other petroleum products, or
garages for the purpose of doing repair work on automobiles or other
kind of motor vehicles, in that part of the town of Wake Forest lying
west of the tracks of the Seaboard Air Line Railway after the first day
of February, 1929, shall be guilty of violating this ordinance, and shall
be liable to the town of Wake Forest for a penalty of fifty dollars
($50) for each station or garage so erected, built, maintained, or
operated; and each day such violation shall continue shall be considered
a separate offense and shall subject the violator to a penalty for each
day."

The ordinance says "Operating any filling station for the sale or dis-
tribution of gasoline," etc. The plaintiff's witness called it "the little
tank which Mr. Medlin has had out there for twenty-five years; . . .
it is covered with ivy and it is a brick building. It is a pretty place."
Can this little curb filling pump be termed a filling station? It is so
insignificant that it can hardly be so termed. The gasoline that is

pumped up is underground. It is at defendant's home that he has occupied for a quarter of a century and this miniature project helps him to make a living. What is a proper exercise of police power is for the courts to determine. The confiscation of private property without compensation is a dangerous thing, and we are fast getting into quick-sand. It is a serious thing to turn over private property, that is not a nuisance *per se,* to the whim of different governing bodies, no matter how capable they may be, that today may destroy and tomorrow make alive.

It is decided by all the courts that a gasoline station is not a nuisance *per se.* This little miniature pump at Wake Forest has been there for years;—is so insignificant that it can hardly come within the purview of the ordinance.

There is not as much danger in selling gasoline in this miniature pump as in selling kerosene oil in a grocery store in a city, a town, or the country. Electricity used in the homes is far more dangerous than this little miniature pump, so are gas ranges, oil lamps and oil heater systems. The confiscation of private property, without compensation, is a dangerous thing. It makes chaotic the rights of private property. In buying property no person is safe, and values are uncertain.

> "As variable as the shade
> By the light quivering aspen made."

Of course you can regulate, but this is confiscation. In the present case there may be prescribed limits under the ordinance applicable to all, but those prescribed limits cannot confiscate private property that is so used that it is not a nuisance *per se,* and has no relation, as all the witnesses testify, to the public health, safety or welfare. Nor to public convenience or prosperity which latter is elusive power and savors of dangerous encroachment. Under the facts in this case, the application of the ordinance is a dangerous precedent and should be declared inoperative. The modern "Tom Thumb Golf Links" would hardly be termed an 18-hole golf course.

It may be noted that it appears from the evidence in this case that the highway passing the defendant's curb pump is State Highway No. 50, and is also National Highway No. 1, and that the same runs on the west side of the Seaboard Air Line Railway Company's tracks from the northern State line to and through Wake Forest and southwardly therefrom for a distance of five or six miles and then crosses the railway on an overhead crossing. It is a matter of common and public knowledge that it was the State's purpose to enable the users of this highway to travel upon the same without the necessity of crossing the railroad at grade anywhere. I think it unreasonable and arbitrary to enact an ordinance which would prohibit the ability of the users, both State and

inter-state, of this highway for a distance of a mile and a half or two miles through the town of Wake Forest to obtain a drop of gasoline unless they depart from the highway and crossed over the main line tracks of the Seaboard Air Line Railway Company at grade in order to purchase the same from some filling station located across the railroad in the town of Wake Forest and nearer to the college properties than the defendant's place of business. This grade crossing, from the testimony of witnesses is a dangerous crossing. I think the ordinance as applicable to defendant's place invalid.

The brief of defendant is so thorough that I have used much of it in the preparation of this dissent.