CITY OF MIAMI BEACH, *et al.,* v. THE TEXAS COMPANY.

194 So. 368
Opinion Filed January 23, 1940
Rehearing Denied March 11, 1940

618

*J. Harvey Robillard* and *Loftin, Calkins & Anderson*, for Appellants;

*M. L. Mershon, W. O. Mehrtens, Evans, Mershon & Sawyer, Harry T. Klein* and *Albert E. Van Dusen*, for Appellee.

PER CURIAM.—The record in this case discloses that during the month of June, 1923, The Texas Company agreed to buy a site on "Fisher's Island" to be used by it as a site for its bulk sales plant. The property and other real estate situated on Peninsular Island was then owned by the Peninsular Terminal Company. Fisher's Island was to be connected by a causeway to be constructed by the Peninsular Terminal Company to the County Causeway. The County Causeway connects the City of Miami with Miami Beach and was constructed in 1923, when Miami Beach had a population of approximately 6,000 people. The industrial area of Miami Beach is situated within the waters of the Port of Miami, and Fisher's Island and the island on which Miami Beach is located are within the waters of Biscayne Bay. The Peninsular Terminal Company filled in and developed the tract of land involved in the case at bar, as well as other areas, in that vicinity.

Simultaneously with the contract to purchase a bulk site on Fisher's Island, the Peninsular Terminal Company agreed to lease to The Texas Company a certain tract of

land located on Peninsular Island having a frontage on the County Causeway and likewise a frontage on the main government channel, and the lease was to continue until the causeway to Fisher's Island, as contemplated, was completed, when the same was to be used as a site for the bulk plant of The Texas Company. The aforesaid plant was to distribute the products of The Texas Company from Vero Beach, south, on the lower East Coast. The products of the Texas Company are brought by boats from Texas into the Port of Miami and are stored in the large all-steel tanks at the bulk plant within the city limits of the City of Miami Beach until sold and distributed over the aforesaid sales territory.

The Texas Company continued to operate its bulk plant situated on Peninsular Island from 1923 until 1930, when the City Council of Miami Beach adopted a zoning ordinance dividing the City of Miami Beach into areas and districts for purposes therein designated, and the entire peninsula, inclusive of the land upon which The Texas Company's bulk plant site was situated, was controlled by the said zoning ordinance, the material portions of which are, viz.:

"Use Regulations—'BF' Business District. In the 'BF' business district no building or land shall be used and no building shall be hereafter erected, constructed, reconstructed or structurally altered which is designed, arranged or intended to be occupied or used for any purpose, unless otherwise provided for in this ordinance, excepting for one or more of the following uses:

"(1)  Any use permitted in the 'BE' business district.

"(2)  Ship yards and dry docks.

"(3)  Oil and/or gasoline storage tanks.

"(4)  Hazardous industries only upon approval and permit by the city council of Miami Beach.

. "(5) Any other use, trade or industry which is not likely to become objectionable by reason of the emission of dangerous, unwholesome, foul, nauseous or offensive gases, odors, fumes or other discharges."

The Peninsular Terminal Company, for some reason, failed or omitted to construct the proposed causeway from the County Causeway to Fisher's Island, and for this reason it was impossible to use the proposed site situated thereon as a bulk plant site, as it was an island with no causeway connection, which was essential to move the products of The Texas Company from its proposed plant by means of motor propelled vehicles for distribution over the sales area.

On August 27, 1932, The Texas Company, by its written agreement agreed to reconvey to the Peninsular Terminal Company the lands situated on Fisher's Island and the Peninsular Terminal Company agreed to sell to The Texas Company the tract, then occupied by it under a lease, situated on Peninsular Island, with additional lands adjacent thereto, but the sale to The Texas Company was not to be completed until the Peninsular Terminal Company obtained the necessary permits from the proper authorities for the construction and maintenance on Peninsular Island of large above-ground tanks for the storage of its products and for the operation and maintenance of a general bulk plant.

Pursuant to the agreement to purchase, The Texas Company in October, 1932, appeared before the city council of the City of Miami Beach and presented its application for a permit to build, enlarge and construct a new, complete and modern bulk plant on the site then occupied by it under a lease and situated on Peninsular Island. In support of the application for a permit, The Texas Company submitted to the city council plans and specifications for the construction of the bulk plant consisting of eight additional

tanks and other improvements to be a part of the proposed bulk plant to be situated on the same lands then occupied by it under a lease and on other lands. The application for said permit was duly considered by the city council of Miami Beach, and upon motion was unanimously carried or granted. The Texas Company, upon the granting of the aforesaid permit by the City Council of Miami Beach, executed its written agreement with the Peninsular Terminal Company and paid to it the sum of $146,323.05, and took title to the lands now involved in this suit.

The Texas Company, after acquiring title, constructed on the aforesaid land a bulk sales plant consisting of steel storage tanks for gasoline, kerosene, and Diesel gas oil; facilities for loading tanks, ships and barges, as well as facilities for unloading tanks, ships and barges; pumping facilities and lines; facilities for loading trucks; a warehouse; an office and garage building; concrete walls around the storage tank area; foam fire protective system; improvement of the bulkhead and loading platform on the government channel; and dredging and construction work along the waterfront to be used by tank boats for the delivery of product at the bulk plant. The property was otherwise improved, at a total expense of $132,083.27.

The storage capacity of the tanks totals 42,000 barrels and are of riveted steel, oil-vapor proof construction; and the vertical tanks are equipped with Oceco pressure and vacuum relief valve. The tanks are surrounded by concrete walls of several feet in height. The Texas company has a modern foam protective system installed about its plant, but the water pressure from the City of Miami Beach watermains is insufficient under normal conditions to operate the same.

On September 24, 1936, the City Council of the City of Miami Beach adopted Ordinance No. 446, which became

effective from and after May 1, 1937, and the material portions are, viz.:

"Be It Ordained by the City Council of the City of Miami Beach, Florida:

"Section 1. That it shall be unlawful for any person, firm or corporation to keep, put, place or store any petroleum, naptha, benzine, gasoline, coal oil or any of the inflammable products of petroleum or any inflammable or explosive oils at any point or points within 1,000 feet distant from any dwelling house, residence or building used as such, or storeroom, building, shed or other like structure within that portion of the City of Miami Beach lying North of the main Government channel, provided, however, that this ordinance shall not apply to the keeping or storing of not more than 6,000 gallons of any petroleum products at a retail mercantile establishment in metal tanks or containers buried at least two feet underground, nor shall the same apply to the keeping of not more than 100 gallons of any petroleum products inside of or at a retail mercantile establishment in metal floor tanks or containers, nor shall the same apply to the keeping of any petroleum products in dwelling houses, residences or buildings used as such, for domestic or household purposes.

"Section 2. Any person, firm or corporation violating any provision of this ordinance shall, upon conviction thereof, be punished by a fine not exceeding Five Hundred Dollars ($500.00), or by imprisonment in the city jail for a period not exceeding thirty (30) days, or by both such fine and imprisonment, provided, however, that each day that the materials or substances set forth in Section 1 hereof are kept, put, placed or stored in any place in violation of the terms of this ordinance shall constitute a separate offense hereunder.

"Section 3. That this ordinance shall be in force and effect from and after May 1st, 1937."

The brief of counsel for appellants recite that Ordinance No. 446, *supra,* was adopted by the City Council of the City of Miami Beach after several years of consideration and many public meetings where arguments were presented and briefs filed, when the ordinance was unanimously adopted by the city council. The ordinance prohibited the maintenance north of the channel from the Atlantic Ocean to Biscayne Bay of large tanks for the storage of petroleum products. This ordinance affected property in the prohibited area owned by the Sun Oil Company, The Texas Company and the Gulf Oil Corporation.

The Texas Company owned several large storage tanks situated along the county causeway from the City of Miami across Biscayne Bay to the City of Miami Beach. The City Council of Miami Beach considered these large storage tanks not only hazardous, but a menace or danger to the lives of persons passing daily over the causeway. It was suggested that if one of the storage tanks should explode and catch on fire, the people then on the causeway between the tanks and the drawbridge would not be able to escape the danger and would perish. It is shown that during the tourist season several thousand people daily use the causeway, and the drawbridge is up a number of times each day to permit or allow the passage of vessels along the channel.

On April 24, 1937, The Texas Company filed in the Circuit Court of Dade County, Florida, its verified bill of complaint against the City of Miami Beach and the city's officials, seeking to enjoin the enforcement of Ordinance No. 446, *supra,* on the grounds: (a) that the ordinance was outside the charter power of the City of Miami Beach; (b)

that the ordinance deprives The Texas Company of its property without due process of law; (c) that the ordinance affects property previously constructed and operated at large expense, with the knowledge and consent of the officials; (d) that the ordinance requires the removal of its structures and the cost thereof would be a loss to The Texas Company; (e) that the contents of the tanks are not dangerous *per se;* (f) the ordinance does not prohibit the maintenance of tanks in every part of the City; (g) the ordinance discriminates in favor of the oil companies by allowing them to remove their tanks and equipment to Fisher's Island.

The City of Miami Beach and its officials filed an answer to the bill of complaint and a motion to dismiss the same on the grounds: (a) that the bill of complaint was without equity; (b) the ordinance is a valid exercise of the charter power of the City of Miami Beach. The lower court, upon a hearing, denied the motion to dismiss the bill of complaint and granted a restraining order directed to the City of Miami Beach and its officials enjoining the enforcement of Ordinance No. 446. From this order overruling the motion to dismiss the bill of complaint and granting a temporary injunction restraining the enforcement of the aforesaid ordinance, an appeal was perfected to this Court, where the case was heard upon briefs and oral argument of counsel for the respective parties, and the motion to dismiss and the order granting a temporary injunction restraining the enforcement of the ordinance was by this Court affirmed. See City of Miami Beach v. Texas Co., 130 Fla. 580, 178 So. 109.

On the going down of the mandate from this Court, and pursuant to agreement of counsel, testimony was taken on the issues tendered by the bill and answer or answers, and

the lower court, after hearing all the testimony adduced by the respective parties, observing the witnesses while on the witness stand, and hearing argument of counsel, the lower court then and there made and entered a final decree in which findings of fact were made by him and enunciated therein certain principles of law controlling the case at bar.

From this final decree an appeal has been perfected to this Court and the case is here for review. Pertinent portions of the final decree appealed from are, viz.:

"(d) The court further finds from the evidence that the plaintiff at all times has been, and is now, lawfully operating its said business and using its said bulk sales plant and lawfully storing therein its gasoline and other petroleum products in its said tanks; and that neither plaintiff's said business nor its said storage tanks nor its said storage of its products therein, nor the operation of its said plant, has at any time constituted, nor now constitutes, a public nuisance or a nuisance *per se,* or a nuisance in fact.

"(e) That said Ordinance No. 446, by prohibiting storage of plaintiff's products within 1,000 feet of any dwelling house or other structure, has the effect of completely prohibiting the plaintiff's continued use of its present storage plant and has the effect of completely prohibiting the acquisition or establishment by plaintiff of any other bulk sales storage plant within the city limits of the City of Miami Beach, in view of the fact, which the court here finds, that the area south of the main Government channel is inaccessible to land transportation, and is for that and other reasons unsuitable and impracticable as a site for bulk storage of petroleum products.

"(f) That the defendants have not, by said Ordinance No. 446, or otherwise, offered to compensate the plaintiff for the loss that plaintiff would sustain through the enforcement of said ordinance. * * *

"(h) That without determining said Ordinance No. 446 to be invalid *per se,* or invalid as applied to a different state of facts, nevertheless, under the factual situation herein found by the court to exist as alleged in plaintiff's bill, said Ordinance No. 446 is, in its application to the plaintiff, The Texas Company, discriminatory, arbitrary, confiscatory and unreasonable; and also denies to plaintiff due process of law and the equal protection of the law provided by Article XIV, Section 1, of the Amendments to the Constitution of the United States and Sections 1 and 12 of the Declaration of Rights of the Constitution of Florida, and is invalid, void and unenforceable by the defendants as to or against the plaintiff, The Texas Company.

"(i) That as a zoning ordinance said Ordinance No. 446 would be and is invalid and unenforceable against the plaintiff, The Texas Company, and ineffectual to prohibit the continuance by the plaintiff of its previously existing lawful non-forming use of its property. * * *

"It Is Thereupon Ordered, Adjudged and Decreed, that the temporary injunction in favor of the plaintiff and against the defendants granted herein under date of May 14, 1937, enjoining said defendants from enforcing or attempting to enforce against said plaintiff, The Texas Company, said City Ordinance No. 446 or said ordinance amending Section 4 of said Ordinance No. 394, is hereby made permanent, and in addition thereto said defendants are permanently enjoined from enforcing or attempting to enforce, because of any matters involved in this suit, said amendment to ordinance No. 394 for any other or subsequent period than that mentioned in said temporary injunction."

One of the first questions here presented is whether or not the City Council of the City of Miami Beach has the

charter power to enact Ordinance No. 446, assuming that it was adopted to promote the health, safety, convenience, welfare and protection of the people of the City of Miami Beach. The charter power and general statutes bearing on this subject applicable to all municipalities are, viz.:

Chapter 16567, Special Acts of 1933, amended Section 28, of the Charter of the City of Miami Beach, being Chapter 7672 of the Laws of Florida, Acts of 1917, so that said Section 28 now reads, in part, as follows:

"Section 28 (as amended 1923). That the City Council shall have the power to make, establish and ordain for the government of said City and the officers of said City, such ordinances in writing and such by-laws and rules of order not inconsistent with this charter, the Constitution and laws of the United States, as they may deem necessary; provided, a majority of the City Council shall assent thereto. They shall have the power to pass all such ordinances, and prescribe penalties for the violation thereof, as may be necessary to define, prevent or abate nuisances; * * *."

"d.  * * * and do or regulate any other matter or thing that may tend to promote the health, welfare, prosperity and morals of the City; * * * to regulate, restrain or prevent the carrying on of manufactures dangerous or increasing or producing fires, * * *; to regulate the storage of gunpowder, tar, pitch, resin, saltpeter, coal oil, kerosene, gasoline, or other combustible, explosive or inflammable material;

"g.  * * * to pass all ordinances necessary to the health, convenience, comfort and safety of the citizens, and to carry out the full intent and meaning of this Act; to accomplish the objects of its intended corporation to impose penalties for the violation thereof. * * *

"m.  The City Council shall have the power to fix and

establish a fire limit within said city, and to prescribe rules and regulations for the erection and repair of buildings in said city, provided that the fire limit as established in the municipality to which the municipality hereby organzed is a successor, shall not be decreased except by the unanimous consent of all persons owning property in any block to be taken from such fire limits. The City Council shall also pass such ordinances as may be necessary to protect and preserve peace and order upon all property owned, leased, managed or controlled by said city outside of the city, and enforce the same by penalties.

"(II)   The City Council shall have power and authority: (e) To impose such other regulations as may be conducive to the safety, welfare and accommodation of the public.

"(III)   In addition to the powers above granted, the City Council shall have all powers and privileges not inconsistent herewith, granted to the City Council of cities and towns by the general laws of the State of Florida, and shall have power to do and perform all things necessary for the government of the city not inconsistent with the Constitution and laws of the United States, the Constitution of the State of Florida, and the terms and provisions of this Act."

Section 1848, Revised General Statutes (2958) C. G. L., empowers cities to prevent and abate nuisances.

Section 1868, Revised General Statutes (2978 C. G. L.) empowers cities to pass all necessary laws to guard against fires.

Chapter 9837, Special Acts of 1923, provides, in part, as follows:

"Section 1.   That, for the purpose of promoting health, safety, morals or the general welfare of the City of Miami Beach, Florida, the City Council of said City, in addition

to all powers or authority now delegated to it, be and it is hereby empowered to regulate and restrict the number of stories and sizes of buildings and other structures, percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residences or other purposes. * * *"

Chapter 13101, Special Acts of 1927, reads in part as follows:

"Section 6. That said City of Miami Beach shall have power:

"(1) * * * to regulate or prevent the establishment or maintenance of any offensive business or thing within said City which may be detrimental to the health, convenience or welfare of the inhabitants or part thereof of said City; * * * to prohibit the creation of dust, smoke and unnecessary noises therein and to regulate the location and manner of keeping stables or any other place which create an offensive odor or noise and generally to define, prohibit, make unlawful, abate, suppress and provide penalties for the doing or maintenance of all things detrimental to the health, comfort, safety, convenience or welfare of a part or all the inhabitants within the said City and in addition thereto to provide and adopt ordinances making any offense which is an offense against the State of Florida an offense against said City, and to provide a penalty upon conviction thereof;

"(n) To extinguish and prevent fires * * *;

"(p) To provide for the preservation of the general health of the inhabitants of said City, * * *;

"(q) To exercise full police powers * * *;

"(t) To adopt ordinances establishing fire limits or zones and to provide when and under what conditions structures for habitation, commercial or other uses may be con-

structed and maintained within or without such zone or zones and the elevation, character and size of materials or things which may be used in such structures and provide for the construction of different classes in such manner as to provide for the safety of persons in, on or about the same, the ventilation thereof and for the admission of natural light therein, and to provide conditions under which such structures may be removed, repaired or added to; and to provide for the issuance of permits for such structures before it is commenced and the conditions under which such permits may be issued, the charge of fees therefor and the inspection by said City of all such structures while under construction and after completion, to provide for the condemnation, demolition and removal of structures damaged by fire, storm or otherwise as to become a menace to health or public safety or a fire hazard, and to ordain such other things relating to the above subjects as will promote or preserve the public health, welfare or safety.

"(x)  To adopt all ordinances or do all things deemed necessary or expedient for promoting or maintaining the general welfare, comfort, education, morals, peace, health, and convenience of said City, or its inhabitants and to exercise all of the powers and privileges conferred upon cities or towns by the general law of Florida, when not inconsistent therewith."

It is generally recognized that anything which is detrimental to health or which threatens danger to persons or property within the city may be retarded and dealt with by the municipal authorities as a nuisance. Under a general grant of power respecting nuisances the municipal corporation may declare a thing a nuisance which is one in fact, but without express charter power, the general rule is that the city cannot declare by ordinance that a nuisance which

is not so in fact. To constitute a thing a legal nuisance, it must be so in fact, regardless of a declaration of an ordinance on the subject. See McQuillin on Municipal Corporations (2nd Ed.), Vol. 3, pages 125-6, par. 956.

We think the City Council of the City of Miami Beach has and possesses ample charter power to enact Ordinance No. 446. See State *ex rel.* Ellis v. Tampa Water Works Co., 56 Fla. 858, 47 So. 358, 19 L. R. A. (N. S.) 183; Taylor v. Roberts, 84 Fla. 654, 94 So. 874; Citizens Ins. Co. v. Barnes, 98 Fla. 933, 124 So. 722; State *ex rel.* Luke v. City of Tallahassee, 100 Fla. 1529, 131 So. 386; *Ex Parte* Theisen, 30 Fla. 529, 11 So. 901; Malone v. City of Quincy, 66 Fla. 52, 62 So. 922, Ann. Cas. 1916D 208; *Ex Parte* Pricha, 70 Fla. 265, 70 So. 406; Mernaugh v. City of Orlando, 41 Fla. 433, 27 So. 34; Cities Service Oil Co. v. City of Marysville, 117 Kan. 514, 231 Pac. 1031, 43 A. L. R. 854; City of Crowley v. Ellsworth, 114 La. 308, 38 So. 199; State *ex rel.* Oil Service Co. v. Stark, 96 W. Va. 176, 122 S. E. 533; City of Miami v. Direct Distributors, Inc., 134 Fla. 430, 183 So. 841; Lees v. Cohoes Motor Car Co., 203 N. Y. S. 65, 122 Miss. Rep. 373; State v. Moye, 200 N. C. 11, 156 S. E. 130; Town of Wake Forest v. Medlin, 199 N. C. 83, 154 S. E. 29; Bryan v. City of Chester, 212 Pa. 259, 61 Atl. 894; Standard Oil Co. v. City of Danville, 190 Ill. 50, 64 N. E. 1110; Magnolia Petroleum Co. v. Wright, 124 Okla. 55, 154 Pac. 41; Independent Pennsylvania Oil Co. v. Mayor of City of Gloucester, 102 N. J. L. 502, 134 Atl. 554; State *ex rel.* McAuley v. York, 90 Fla. 625, 106 So. 418.

Counsel for appellants next contend that the lower court abused its discretion in its findings of fact on final hearing and for this reason the decree appealed from should be reversed as the evidence adduced by appellants indisputably

shows that The Texas Company's plant is a marine oil terminal and that the National Board of Fire Underwriters, in 1930, made rules and recommendations to be observed at such terminals when gasoline was being loaded and unloaded in congested districts which are not adhered to and the plant here involved is located on Biscayne Bay and has a wharf frontage where tankers unload petroleum products and the danger of ignition is increased by its failure to observe certain fundamental rules while transferring flammable liquids.

It is suggested that fires could originate from a spark of static electricity while filling drums on the dock of The Texas Company's warehouse, or by ignition from a worn hose line used in unloading flammable liquids in bulk form from the tanker to the plant or a spark could originate at the plant by the method used in transferring Ethyl Aviation gasoline from the ships onto the dock or a possible explosion of empty Aviation gasoline drums still containing a small amount of gasoline and vapor could occur; that the floor of the warehouse where flammable liquids are stored contains a large percentage of wood, and the warehouse is located in close proximity to the storage tanks, and no marine fire protection is available to the plant.

It is contended that the pipe lines around the plant are above the ground and a fracture therein would create a serious fire hazard by releasing oils into the dikes; that dangerous fires could originate on the platform of the plant where trucks are loaded by ignition from the operation of the truck, friction or otherwise, and that the valves on the tanks have no flame arresters to prevent a flame from getting into the tanks and igniting the vapors; that the plant contains a tankage of some 42,000 barrels, and a serious fire in the office building could result in explosions of these

tanks, or a spark from either of the thirty-five automobile trucks loaded with gasoline daily leaving the plant and going out into congested traffic on the causeway is a hazard; that there is not enough water vailable to cool the tanks in the event of a fire at the plant and that a delay of a few minutes would culminate in a disaster, and that the tanks and all other instruments used in transferring the flammable liquids are exposed to lightning.

The growth of the City of Miami Beach from 6,000 people to 14,000 within a few years and the money invested in improving and developing the city, it being a tourist city rather than an industrial one, and the foregoing are some of the reasons offered by the City Council of Miami Beach for enacting Ordinance No. 446, asserting that the ordinance was essential to the public safety of the people of Miami Beach and to tourists in the Winter, as well as the health, peace, good order and general welfare of the community.

Counsel for appellee contend that the evidence adduced fully supported the findings of fact made by the chancellor below as expressed in the final decree and that no other conclusion could have been reached. That The Texas Company constructed and established its plant in accordance with the City's requirements, and that it has been properly operated and safely managed, and its actions have been approved by the City Fire Department for more than fifteen years; that the bulk plant is modernly equipped and used solely for storage and is situated on an island adjoining the County Causeway some 2,500 feet from the mainland of the City and 1,000 feet from any building in the City other than a power plant and other industrial property. That The Texas Company invested over $300,000.00 in acquiring the land and building its plant, then having before it the

location thereof and its accessibility to water and its approach by motor vehicles, all of which was done by the consent and approval of the City of Miami Beach. That The Texas Company has a foam system about the plant which fully protects it from fire, and by reason of the painstaking manner in which the storage plant is operated no fire danger arises in connection therewith. That if Ordinance No. 446 is enforced it will destroy the company's business and the use and value of its plant and no provision is made in the ordinance for compensation therefor. That the plant was not a nuisance when the ordinance was adopted and for this reason the ordinance is unreasonable and unconstitutional as applied to The Texas Company and on judicial review, from the evidence adduced, the lower court so held in its final decree.

While constitutional guaranties cannot be transgressed, it is well settled law that the possession and enjoyment of all rights are subject to the police power * * * and persons and property are subject to restraints and burdens necessary to secure the comfort, health, welfare, safety and prosperity of the people. See 11 Am. Jur., page 1006, par. 267. It is a well settled rule that all property is held subject to the right of the State to regulate it under the police power in order to secure safety, public welfare, health, peace, public convenience and general prosperity. The rule is based upon the concept that all property is held on the implied · condition or obligation that its use shall not be injurious to the equal rights of others to the use and benefits of their own property. The public interest is paramount to property rights. See 11 Am. Jur., page 1009, par. 268. The right of the State to regulate a business which may become unlawful is a continuing one, and a business lawful today may, in the future, because of changed conditions, the growth of

population, or other causes, become a menace to the safety and public welfare and the continuance thereof must yield to the public good. 11 Am. Jur., page 1044, par. 284. The determination of what businesses are affected with a public interest is primarily for the Legislature, but is always open to judicial inquiry. 11 Am. Jur., page 1060, par. 294; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U. S. 418, 71 L. Ed. 718, 47 Sup. Ct. 426, 58 A. L. 1236. The law requires that all police regulations must be reasonable under all circumstances. The validity of a police regulation therefore depends on whether, under all circumstances, the regulation is reasonable or arbitrary and whether it is reasonably designed to accomplish a purpose falling within the scope of the police regulations. See Mutual Loan Co. v. Martell, 222 U. S. 225, 56 L. Ed. 175, 32 Sup. Ct. 74, Ann. Cas. 1913B 529.

The rule of reasonableness as applied to a municipal ordinance, like the ordinance in the case at bar, is treated by 11 Am. Jur., page 1091, par. 307, viz.:

"307. Rules as Applied to Municipal Ordinances.—In instances where the State Constitution grants home-rule powers of police to municipalities or in instances in which the police power has been delegated by the Legislature to a municipal corporation, the same general principles which govern the reasonableness of State police enactments have application, and the courts may inquire under the same rules into the reasonableness of the police measures enacted by the municipality. It is important to distinguish between the common-law right of courts to review generally the question as to the reasonableness of any ordinance and by-laws of municipal corporations independent of constitutional questions and the right of the judiciary to scrutinize the reasonableness from a constitutional standpoint of enact-

ments of the Legislative department of a city, as well as of the State, made in the exercise of the police power. It is the general rule that a municipal ordinance must be generally reasonable to be valid and that the reasonableness of a municipal ordinance is a proper subject for judicial inquiry, irrespective of any question as to the right of the judiciary to pass on the constitutional reasonableness of regulations enacted under the police power. On the other hand, whenever a municipal corporation is expressly authorized by legislation or constitutional provisions to enact a certain ordinance in execution of the police power, such an ordinance stands on the same basis as a statute, and its reasonableness or unreasonableness is not a matter for the courts as such a question would bear on the constitutionality of a statute of the same nature. In other words, as to such an ordinance, the common law doctrine of the judicial review of the reasonableness of the by-laws of municipal corporations has no application.

"In accordance with the general principles governing the determination of the reasonableness of State legislation, the question of the reasonableness of an ordinance is one in the first instance for the determination of the body which enacted it. A city, as the arm of the State, has in the exercise of the police power a wide discretion in determining what precautions in the public interest are necessary and appropriate under the circumstances. Its exercise of the police power will not be interfered with by the courts in the absence of a clear abuse of discretion, unless it is manifestly unreasonable and oppressive, for it is not within the province of the courts, except in clear cases, to interfere with the exercise of the power reposed by law in municipal corporations to pass ordinances relating to objects within the proper domain of the police power. Municipal by-laws

and ordinances undertaking to regulate are, however, subject to investigation by the courts with a view to determining whether they are lawful exercises of the police power or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the right to carry on a lawful business, to make contracts, or to use and enjoy property. Where the legislative enactment is manifestly unreasonable and arbitrary and offends against prohibitions within the Federal or State Constitution, it becomes the duty of the judiciary to declare the ordinance invalid."

One attacking the validity of an ordinance has the burden of establishing its invalidity when such ordinance appears on its face to have been regularly enacted. See State *ex rel.* Taylor v. City of Jacksonville, 101 Fla. 1241, 133 So. 117. All presumptions will be indulged in favor of the validity of an ordinance when regularly enacted. See State *ex rel.* McAuley v. York, 90 Fla. 625, 106 So. 418. The Legislature, under Section 8 of Article VIII of the Florida Constitution, may authorize a municipality to regulate uses of property by its owner when no provision of the organic law is violated. See State *ex rel.* Shad v. Fowler, 90 Fla. 155, 105 So. 733. A municipality by ordinance, having the charter power so to do, may under the police power regulate the safety of the people. See Taylor v. Roberts, 84 Fla. 654, 94 So. 874.

The reasonableness of a statute is not open to judicial review unless organic law is violated, but the reasonableness of a municipal ordinance is subject to judicial review or determination. See Roach v. Ephren, 82 Fla. 523, 90 So. 609. In the case of Pounds v. Darling, 75 Fla. 125, 77 So. 666, this Court, speaking through Mr. Justice ELLIS, stated the essentials of a valid ordinance, and said:

"\* \* \* To be valid an ordinance must be reasonable and not in conflict with any controlling provision or principle of law (Waller v. Osban, 60 Fla. 268, 52 South. Rep. 970) ; should be within the powers expressly or impliedly conferred (Hardee v. Brown, 56 Fla. 377, 47 South. Rep. 834; Malone v. City of Quincy, 66 Fla. 52, 62 South. Rep. 922; Ferguson v. McDonald, 66 Fla. 494, 63 South. Rep. 915), and if any doubt exists as to the extent of a power attempted to be exercised by a municipality out of the usual range, or which may affect the common-law right of a citizen, it is to be resolved against the municipality. Anderson v. Shackleford, 74 Fla. 36, 76 South. Rep. 343."

See State *ex rel.* Hosack v. Yocum, 136 Fla. 246, 186 So. 448; State *ex rel.* Reynolds v. City of St. Petersburg, 133 Fla. 766; 183 So. 304; Prior v. White, 132 Fla. 1, 180 So. 347; State *ex rel.* Harkow v. McCarty, 126 Fla. 433, 171 So. 314.

In the case of Dutton Phos. Co. v. Priest, 67 Fla. 370, 65 So. 282, the Court had before it the validity of a statute making a company or individual liable in damages to any person injured where holes or pits are dug and left open. The plaintiff, Priest, brought suit to recover under that statute and the constitutionality thereof was considered and upheld by this Court, when the language was used, viz.:

"Where a statute may be so construed as to render it unconstitutional, a construction in accord with organic law should be adopted when it can fairly be done; and when by a just and reasonable construction of a statute with reference to the object designed, its operation and effect will not violate the Constitution, a party attacking the statute on the ground that it may be so construed as to invade private rights secured by the Constitution, must show that in the case he presents, the effect of applying the statute

is to deprive him of a constitutional right. The application of a statute in a particular case may violate organic law, but the statute as framed may not be unconstitutional when properly applied. See Cedar Street Co. v. Park Realty Co., 220 U. S. 107, 31 Sup. Ct. Rep. 342; * * *."

The case of Seaboard Air Line Ry. v. Robinson, 68 Fla. 407, 67 So. 139, was a suit to recover double damages and attorney's fees allowed under a statute for not paying the claim within sixty days after receipt of written notice of loss. The constitutionality of the statute was challenged and the same was sustained and held valid as applied to the facts of the case. The Court further held that a statute may be valid as applied to one state of facts, though under another state of facts an application of the statute may violate rights secured by the organic law.

In the case of *In Re:* Seven Barrels of Wine, 79 Fla. 1, 83 So. 627, this Court held that a statutory regulation may, consistently with organic law, be applied to one class of cases in controversy and may violate the Constitution as applied to another class of cases. This does not destroy the statute; but imposes the duty to enforce the regulation when it may be legally applied.

In the case of Euclid v. Ambler Realty Co., 272 U. S. 365, 71 L. Ed. 303, 47 Sup. Ct. 114, 54 A: L. R. 1016, the Court had before it the construction of a zoning ordinance, and used language, viz.:

"* * * In the realm of constitutional law, especially, this Court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as

they arise, rather than by out-of-hand attempts to establish general rules to which future cases may be fitted. This process applies with peculiar force to the solution of questions arising under the due process clause of the Constitution as applied to the exercise of the flexible powers of police, with which we are here concerned." See: Miami Home Milk Producers Ass'n. v. Milk Control Board, 124 Fla. 797, 169 So. 541; Town of Boynton v. State, 103 Fla. 1113, 138 So. 639; Osborne v. State, 33 Fla. 162, 14 So. 588, 25 L. R. A. 120, 39 Am. St. Rep. 99; Cason v. Quinby, 60 Fla. 35, 53 So. 741; Kansas City S. Ry. Co. v. Anderson, 233 U. S. 325, 34 Sup. Ct. 599, 58 L. Ed. 983; Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 29 L. Ed. 185; Nashville C. & St. L. Ry. v. Walters, 55 Sup. Ct. Rep. 486, 294 U. S. 405, 79 L. Ed. 949; El Paso & N. E. R. Co. v. Gutierrez, 215 U. S. 87, 30 Sup. Ct. Rep. 21, 54 L. Ed. 106; Osborne v. State, 164 U. S. 650, 17 Sup. Ct. Rep. 214, 41 L. Ed. 586; State v. Smiley, 65 Kan. 240, 69 Pac. 199, 67 L. R. A. 903, 6 R. C. L. 130; People v. ONeil, 109 N. Y. 251, 16 N. E. 68; Magee v. Treasurer and Receiver General, 256 Mass. 512, 153 N. E. 1; Gray v. City of St. Paul, 105 Minn. 19, 116 N. W. 1111.

The lower court, on final hearing, held that the gasoline stored in the tanks was not dangerous *per se* to the safety of the people of Miami Beach and that the appellee, by competent evidence, established that in the management and operation of the bulk plant there was but little, if any, hazard or danger to life and property, and there is evidence in the record to support these findings of fact. The conclusions of a chancellor on questions of fact will not be disturbed on appeal unless clearly erroneous. See Farrington v. Harrison, 95 Fla. 769, 116 So. 497; Atlantic Bank, etc., Co. v. Sengstak, 95 Fla. 606, 116 So. 267; Mock v.

Thompson, 58 Fla. 477, 50 So. 673; Lucas v. Wade, 43 Fla. 419, 31 So. 231; Kent v. Knowles, 101 Fla. 1375, 133 So. 315, 317.

We therefore hold Ordinance No. 446 constitutional and valid but the application of the ordinance to The Texas Company's bulk plant would in effect require abandonment thereof, the possible loss of a large sum of money invested in the property, and would materially affect the revenues of an established business, and the same, in its application as appears here, renders the ordinance arbitrary. The law, on the showing here made, will not permit or allow the appellee to be deprived of its property, or the ordinance, *supra,* enforced or applied on the facts established by this record. If the increase in population continues at Miami Beach; or if the present rate of building or construction is continued; or if The Texas Company fails or otherwise omits to maintain the present standard of public safety in and about the bulk plant; or if changed conditions, or other things, occur which may be reasonably calculated to increase the hazard or danger of the people of Miami Beach by the maintenance and operation of the aforesaid bulk plant, then the City of Miami Beach can, and is hereby reserved the right to, take such legal steps as may be necessary to enforce the ordinance for the safety and protection of the people of Miami Beach.

The decree appealed from is hereby affirmed.

TERRELL, C. J., WHITFIELD, BUFORD, CHAPMAN and THOMAS, J. J., concur.

BROWN, J., not participating.