Complainant seeks to enjoin the defendant from alleged violations of the so-called Milk Control act, chapter 169 (P.L.1933 p. 353), and, at the final hearing, it was conceded *Page 297 
that the defendant had not complied therewith in so far as such milk as is used in the manufacture of ice cream was concerned, but that it had attempted to comply in so far as milk being used by it for other purposes went.
There appear to have been some minor violations with respect to the milk other than that used in manufacture, but these matters have been adjusted and do not require injunctive relief.
Defendant attacks the constitutionality of the act on various grounds, all of which have been disposed of so far as this court is concerned by the decisions in the case of People v. Nebbia,262 N.Y. 259; 186 N.E. Rep. 694, and the supreme court of the United States in Nebbia v. New York, 291 U.S. 502;78 L.Ed. 940, and an unreported case in the court of chancery of Stateof New Jersey v. Newark Milk Co., decided by Vice-Chancellor Berry.
The question for determination is — do the provisions of the "Milk act" extend to the purchase of milk intended to be used for manufacturing ice cream? — and this question is to be determined by the legislative intent, as gathered from the act, with recourse to such aids in determining that intent as have been presented to the court.
I have before me the act as finally passed, and the original bill as introduced on April 4th, 1933, by Assemblyman Newcomb, and in addition to that, the Milk Control act of the State of New York, to which reference is made in the act sub judice.
Taking up the provisions of chapter 169 of the laws of 1933. We find a preamble consisting of several recitals:
(a) During the past six months groups of milk producers have joined together and adopted means or methods to control the production, sale and distribution of fluid milk, in order to force a better return to the milk producers.
(b) The methods pursued have tended to a denial to the public of a sufficient supply of good wholesome milk.
(c) By reason of non-availability of milk markets for the local producer, fluid milk is being shipped into the State of New Jersey and into New York and Philadelphia, at such prices that producers who supply milk "to the residents of this state" are unable to receive a sufficient return. *Page 298 
(d) Efforts are now being made in Philadelphia and New York and New Jersey to restrict the milk supply by picketing, c., in order to force a higher price for fluid milk, with the result that New York has recognized the seriousness of the situation and has "already enacted into law a measure which they believe will protect the citizens of that commonwealth."
(e) "By reason of the action of the State of New York it becomes imperative that similar precautionary measures be put into effect in this state."
Then follows the declaration of legislative intent and it is recited that the legislation was passed in the exercise of the police power reserved to the states in order to protect the public health and welfare of the inhabitants of the state, and as a necessary measure for immediate preservation of the public peace, health and safety.
The reason given for such necessity is: "that evils consisting as hereinbefore recited * * * are now being carried on in theproduction, sale and distribution of milk for human food, which are likely to result in the undermining of health * * * the demoralization of agricultural interests * * * and the creation of conditions inimical to the health of milk consumers."
Taking the act itself and not resorting to outside aids in construing its provisions, it seems to me that the legislative intent was not to include within the purview of the act milk purchased to be used for the manufacture of ice cream.
It is true that a reading of the "Declaration of Legislative Policy and Intent" demonstrates that the legislature intended to correct evils recited in the preamble to the act and that these evils were being "carried on in the production, sale and distribution of milk for human food, which are likely to result in the undermining of health regulations, * * * the demoralization of the agricultural interest * * * engaged in the production of milk and the creation of conditions inimical to the health of milk consumers."
To accomplish this result the legislature enacted into law the act in question.
It must be conceded that the title of the act is broad enough to include milk purchased and intended to be used for manufacture into ice cream and that the legislature had as much right to control and regulate such milk as the rest of the *Page 299 
supply, but it seems to me that the legislature has clearly defined the milk it intended to regulate and control.
Article 1 of the act defines the milk spoken of by the legislature as follows:
"The natural product of a dairy animal or animals, and includes such product when cooled, pasteurized, condensed or concentrated except when contained in hermetically sealed cans, with a view to being sold as milk and also cream, buttermilk and skimmed milk, sold or intended to be sold as such for human food; said termexcludes the natural product of a dairy animal or animals sold orintended to be sold for any other purpose."
This definition includes and excludes. In includes the natural product of dairy animals when cooled (the natural product cooled), pasteurized (the natural product heated), condensed or concentrated (milk from which the water has been evaporated or extracted, i.e., not the natural product, but manufactured), and specifically states that the inclusion applies to such product only when it is handled with a view to being sold asmilk, and also cream, buttermilk and skimmed milk, and then only when sold or intended to be sold as such for human food. The result is that the legislature evidently did not intend to attempt to control the milk supply, no matter what its form, unless it was milk intended to be sold as milk, cream, buttermilk and skimmed milk for human food. A dealer could, therefore, purchase any quantity of milk at any price and from any source for any other purpose and not be subject to the regulation of the act or to its penalties, and in order to make this feature clear, the legislature expressly excludes "the natural product" of dairy animals sold or intended to be sold for any other purpose than "as milk, cream, buttermilk and skimmed milk for human food."
The legislature, of course, knew that amongst the many uses to which milk was put was the manufacture of ice cream, and with that knowledge, distinctly said that the milk about which they were concerned and legislating was "milk to be sold as milk, and also cream, buttermilk and skimmed milk, sold or intended to be sold as such for human food."
Having in mind the legislative definition of milk, we go to the title of the act, "An act to regulate and control the *Page 300 
purchase, distribution and sale of fluid milk and cream and to declare an emergency, and for this purpose to create a state board of milk control, defining its powers and duties and providing penalties for violations."
A more comprehensive title and one including the definition, would have been — An act to control the purchase, distribution and sale of the natural product of a dairy animal or animals, including such product when cooled, pasteurized, condensed or concentrated (except when contained in hermetically sealed cans), with a view to being sold as milk, and also cream, buttermilk and skimmed milk, sold or intended to be sold as such for human food; said terms exclude the natural product of a dairy animal or animals sold or intended to be sold for any other purpose.
Assuming the above definition of milk, as read into the title of the act, may it be said that the legislature intended to include within the purview of the act milk intended to be manufactured into ice cream and to be sold as such for human food?
It seems quite apparent that the legislature sought to correct the evil practices and the effects thereof, as recited in the declaration of intent, by regulating and controlling the milk supply other than that to be used in the manufacture of ice cream, cheese, soup, c., and that it believed that the great percentage of fluid milk was used as such for human food, and to regulate and control the great bulk would be sufficient.
Now, then, resorting to outside aids for the purpose of arriving at the legislative intention and not for the purpose of altering, adding to or enlarging the legislative enactment as it was finally passed, let us see what the legislature had before it during the progress of the legislation. It had the original bill as introduced by Assemblyman Newcomb, and the New York act, and in both of these documents milk is defined.
In the Newcomb act milk is defined "liquid milk and/or cream." In the New York act milk is defined "milk means liquid milk and/or cream, fresh, sour or storage; and/or condensed or concentrated whole milk except when contained in hermetically sealed cans." *Page 301 
It will be observed that neither definition contains any such limitation as that in the statute finally passed. Newcomb speaks of any and all liquid milk and cream and the New York act of liquid milk and cream, fresh, sour or storage, and yet with these acts and these definitions before the legislature it was distinctly enacted that the milk to be controlled was that "with a view to being sold as milk and also cream, buttermilk and skimmed milk, * * * sold as such for human food."
Again having in view the Newcomb act as originally introduced, we find that the recital as to the evil practices and the desirability of remedial legislation are of similar purport to those in the act as passed, and in the Newcomb act the purpose and aim of the legislation is declared to be "that in order to protect the well-being of our citizens and promote the public welfare, and in order to safeguard the production, transportation, manufacture, storage, distribution and sale of milk in the State of New Jersey, the business of producing, selling and distributing milk and milk products in this state is declared to be a business affecting the public health and interest."
The New York act contains a like statement of legislative intent in the following language: "that in order to protect the well-being * * * the production, transportation, manufacture, storage, distribution and sale of milk in the State of New York is hereby declared to be a business affecting the public health and interest."
In the act as finally passed the legislature carefully omitted any reference to manufacture and struck out "milk products," and said: "The reason for such necessity is that evils consisting as hereinbefore recited, of unfair * * * practices are now being carried on in the production, sale and distribution of milk forhuman food," c. The omission of any reference to "manufacture" and "milk products" in the act as finally passed, taken in connection with the definition of milk as defined in the act, is significant of the intention of the legislature and against the theory that milk intended to be manufactured was included.
But it is argued that the act as passed under article 3, "General Powers," vested the milk control board with full *Page 302 
power to regulate "the entire milk industry * * * including the production, importation, transportation, manufacture, storage, distribution, delivery and sale of milk and milk products in the State of New Jersey, in those matters as in the declaration of legislative policy and intent stated in this act to be necessary."
The general power to control and regulate the entire industry, including manufacturing, does not give such power over any other milk than that defined, and the extent of power over any milk intended for manufacturing purposes is confined by the definition to "cooled, pasteurized, condensed or concentrated" milk, unless it be said that cream, buttermilk and skimmed milk come under the category of manufactured milk.
The same argument is made with reference to article 5, "Licenses," in which it is provided, inter alia, that a dealer must have a license to manufacture, and the same answer results as above indicated and is applicable to every provision in the act where the term "manufacture" is used, i.e., manufacture as confined in the terms of the definition.
So also with reference to article 7, "Fixing of Price and Violations," the milk included is that defined.
It is also pointed out by the state that the "declaration of legislative policy and intent" recites various means and methods to control the production, sale and distribution of fluid milk by producers of milk in many sections of the United States for the purpose of increasing the price of that commodity and that the result has been the dumping of milk, picketing, c., and that the reason for the necessity of correcting the evil is the "unfair, unjust * * * practices now being carried on in the production, sale and distribution of milk for human food" which is tending toward "the demoralization of the agricultural interest of this state engaged in the production of milk."
It is said that the declaration of legislative policy and intent, as above set forth, is made "for the benefit of all milk producers, regardless of the purpose to which their milk is ultimately placed." This is true, but the legislature evidently thought that the extent of the necessity for the regulation *Page 303 
and control was confined to "the natural product of a dairy animal or animals * * * when cooled, pasteurized, condensed or concentrated * * * with a view to being sold as milk, and also cream, buttermilk and skimmed milk, sold or intended to be sold as such for human food" and in order that there might be no doubt about it, concluded the definition of milk by "said term excludes the natural products of a dairy animal or animals sold or intended to be sold for any other purpose."
It is next argued that "even if the case was not within the letter of the law, it can and should, by equitable construction, be brought within the spirit and intent as it is within the mischief which the act was intended to remedy."
There can be no question but that the legislative enactment is in derogation of the common law and that being the case, it is well settled that the statute may not be given the liberal construction for which the state contends, but that it must be strictly construed. Hill v. Hill, 93 N.J. Eq. 567, 573,
citing cases.
But even were this not so, the real intention of the legislature, it seems to me, so clearly appears that to hold that milk purchased for the purpose of manufacturing into ice cream was within the purview of the act, in view of the language used in the definition of milk, would be in effect a judicial extension of the provisions of the act.
A literal construction of the language of the act does not lead to any absurdity, so that there is no need of a construction to avoid such a result. The object designed to be reached was, of course, the fluid milk supply both within and without the state, in so far as the latter might come into the state, but the legislature sought to accomplish this purpose without affecting those purchasing milk for manufacture into ice cream, cheese and the other articles not mentioned within the definition of milk.
I have, it is true, pointed out various differences in the act as finally passed and enacted into the law and those in the original "Newcomb act," as well as differences between the New York act and the one sub judice, but the same result would have been reached without these aids of construction. *Page 304 
It is argued that "the court cannot resort in aid of construction to the history of legislation in the process of passage through the senate and house of assembly," citingAttorney-General, ex rel. Pierson v. Cady, 84 N.J. Law 54 (at bottom of page 56).
The Picrson-Cady Case was based on and cites StandardUnderground Cable Co. v. Attorney-General, 46 N.J. Eq. 270, in which case an attempt was made to add a comma in order to bring about the construction contended for and, for that purpose, the files and journals of the two houses were offered in evidence. The court of errors and appeals sustained the exclusion of the evidence and said:
"It has stood unquestioned in this state for a quarter of a century, and in Board of Freeholders of Passaic v. Stevenson,17 Vr. 173, received the express approval of this court. That case must now be regarded as declaring the settled law of this state. The distinction sought to be drawn between that case and this is illusory. The principle established in the decided case is controlling in this. The general doctrine declared was, that the enrolled statute of a state `is conclusive proof of the enactment as well as the contents of the statute, and that such attested copy cannot be contradicted by the legislative journals, or in any other mode.' Now, whether the attempt be by such extrinsic means to add to, take from or entirely abrogate the law, it equally assails that conclusiveness of proof ascribed to the duly authenticated statute."
In State, ex rel. Pangborn v. Young, 32 N.J. Law 29 (at p.32), the court said:
"The precise point to be considered is thus advanced in the arguments of counsel: on the part of the plaintiff, it is maintained that the act, as found in the office of the secretary of state, exemplified under the great seal, is conclusive evidence of the existence and contents of the statute; while, on the other hand, it is urged that, when a doubt arises or is suggested, whether, in the passage of the act, the substantial forms of the constitution have been observed, the court will satisfy itself on these points by a reference to the journals of the two houses of the legislature." *Page 305 
The court held that:
"Where an act has been passed by the legislature, and signed by the speaker of each house, approved by the governor as authenticated by his signature, and filed in the office of the secretary of state, an exemplification of it under the great seal is conclusive evidence of its existence and contents." And "It is not competent for this court to go behind this attestation, or to admit evidence to show that the law as actually voted on and passed and approved by the governor, was variant from that filed in the office of the secretary of state," and that evidence cannot be received for any such purpose.
It is apparent from the above cases that if the Newcomb act and the New York act had been used by the court for the purposes of adding to, varying or altering the explicit terms of the act as finally passed, such a use would have been unwarranted, but there is nothing in any of the above cited cases which holds that the court may not make use of the aid of the two acts for the purpose of assistance in reaching the legislative intent under the terms of the act as finally passed.
But on the other hand, there is ample authority for the proposition that: "The actual proceedings of congress or a state legislature, apart from opinions expressed in debate, may assist in determining the construction of a statute of doubtful import, and courts may avail themselves of such light as the history of the steps taken in the enactment of the law as disclosed by the legislative records may afford." 25 R.C.L. 1039 § 271.
So Vice-Chancellor Buchanan, in Maul v. Martin, 116 N.J. Eq. 479
(citing Winne v. Cassale, 100 N.J. Law 291 (at pp. 294,295), referred "to the original bill as introduced in the legislature."
Being of the opinion that the legislative intent to include within the purview of the act milk purchased for the purpose of manufacture into ice cream does not appear but that, on the contrary, it does appear that it was the intention of the legislature to exclude such milk from the operation of the act, an injunction will be denied. *Page 306