**E. W. SCARBOROUGH, as Director of the Beverage Department of the State of Florida, v. WEBB'S CUT RATE DRUG COMPANY, INC., a corporation organized and existing under the Laws of the State of Florida.**

8 So. (2nd) 913          En Banc
March 27, 1942       On Rehearing June 23, 1942

J. Turner Butler, LeRoy Allen, John B. L'Engle and Joseph I. Davis, for petitioner.

Whitaker Brothers and J. Lewis Hall, for respondent.

CHAPMAN, J.:

This case is before the Court on petition for writ of certiorari to review interlocutory orders entered by the Circuit Court of Pinellas County, Florida: (a)

denying a motion to dismiss the bill of complaint; and (b) restraining the Director of the State Beverage Department from enforcing the several provisions of Chapter 21001, Acts of 1941, Laws of Florida. The suit was brought by a licensed retail liquor dealer. Chapters 16774, Acts of 1935, 18015 Acts of 1937, and 19301, Acts of 1939, created the State Beverage Department of Florida and enumerated and specified its several duties.

Chapter 18395, Acts of 1937, is an Act designed to protect trade mark owners, producers, distributors, and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade mark, brand or name, through the use of voluntary contracts establishing minimum resale prices and providing for refusal to sell unless such minimum resale prices are observed. Chapter 19201, Acts of 1939, is an Act designed to protect good will represented by trade marks, names or brands against injury by authorizing contracts establishing resale prices on commodities bearing them and defining as unfair competition and making actionable knowingly and wilfully to advertise and sell such commodities at less than the prices established in the contracts authorized thereby, whether or not such party so advertising is a party to the contract.

The challenged orders held invalid and unconstitutional Chapter 21001, Acts of 1941. Section 1 provided that the Act shall be administered, construed and controlled by the several Acts, *supra*, applicable to the Beverage Department of Florida. Section 2 of the Act provides:

"Section 2. Fair Trade Contracts, Minimum Resale Prices, Provisions, Concerning. No distiller, rectifier, blender, distributor or vendor, or anyone for them, who holds a license in this State to sell intoxicating liquors, as defined in Section 5 of Chapter 16774, Laws of Florida, 1935, and any and all amendements thereto, which bears a trade mark, brand, label or name of the producer or owner and which is in fair and open competition with the commodities of the same general class produced by others, shall offer any intoxicating liquors for sale in this State in any manner or at all without complying with the provisions of this Act.

"All intoxicating liquors sold in this State by any licensee, licensed to distribute intoxicating liquors, must be sold according to a fair trade contract, and each such licensed distributor shall file with the Beverage Department a complete list of all intoxicating liquors offered for sale which list shall indicate minimum resale prices on all intoxicating liquors according to the size of containers in which sold and in addition thereto such distributor shall file with the Beverage Department all minimum resale price changes as they shall occur from time to time which such price list and changes thereto shall constitute a fair trade contract under this Act and as provided in Chapter 18395, Laws of Florida, 1937; Chapter 19201, Laws of Florida, 1939, and any and all amendments thereto, which fair trade contracts must provide the following minimum resale prices:"

Sub-section (a) of Section 2 provides that a minimum mark- up resale price shall not be less than forty per cent.; (b) all minimum mark-up resale prices shall be calculated on the actual price to the retailer, plus transportation costs and taxes; (c) provides a penalty

for a violation thereof; (d) the entire State of Florida shall constitute a single trade area. Section 3 requires that the Beverage Department shall iron out difficulties arising under the Act. Section 4 requires that a copy of all the fair trade contracts shall be filed with the State Beverage Department. Section 5 requires that copies of all amendment to the fair trade contracts, if any, shall be filed with the Beverage Department. Section 6 provides that vendors can reduce the minimum resale prices on closeout sales for certain enumerated reasons appearing therein. Section 7 provides a penalty for a violation of the Act. Section 8 provides:

"Section 8. The purpose of this Act is to require that fair trade contracts be filed with the Beverage Department and enforced in every respect.

The Beverage Board is hereby vested with plenary powers to make rules and regulations, and the Department is required to provide forms from time to time that may be necessary to regulate the liquor industry and to make this Act effective in its entirety.

"When there has been, in the opinion of the Director of the Beverage Department, by any licensee, any wilfully and knowingly offering for sale or selling, any intoxicating liquor at less than the price stipulated in any fair trade contract entered into pursuant to the provisions of this Act, or any violation of any rule or regulation promulgated by the Beverage Department in enforcing this Act, the licensee so charged shall be deemed guilty of unfair competition and subject to any of the penalties prescribed in the Beverage Act (consisting of Chapter 16774, Laws of Florida, 1935; Chapter 18015, Laws of Florida, 1937; and Chapter

19301, Laws of Florida, 1939, and any and all amendments thereto), as the Beverage Board may determine."

Section 10 requires the Director and supervisors of the Beverage Department to enforce the several provisions of Chapter 21001, Acts of 1941.

The courts will presume in favor of the constitutionality of a statute and will be inclined to a construction favorable to its validity. Smetal Corporation v. West Lake Investment Co., 126 Fla. 595, 172 So. 58. If a doubt exists as to the constitutionality of a statute, the doubt should be resolved in favor of its constitutionality. Williams v. Town of Dunnellon, 125 Fla. 114, 169 So. 631. It is presumed that a statute is constitutional and the burden rests on the party claiming the contrary to clearly establish his contention. Neisel v. Moran, 80 Fla. 98, 85 So. 346.

The owner of property has an inherent right to fix a price at which he will sell. The Federal and State Constitutions protect an owner of property or a business from price regulations arbitrarily and discriminately enacted. Although these principles are well established, the police power of the Constitution grants to the Legislature the power to enact legislation in behalf of the general welfare, health, morals, safety, or business or property affected with a public interest, it may enact reasonable regulations or prices, rates and charges without discrimination or may delegate such power to a Commission. Regulations of this type have been sustained in enumerated cases, viz:

". . . attorney's fees for services in presenting claims against the federal government, or against

the Bureau of War Risk Insurance, or in bringing suit under a workmen's compensation statute; barber's charges; employment agency charges; live stock market agency charges; milk prices; insurance rates; rents; steam heating rates; tobacco warehouse charges; used car price allowances; and wage assignment discounts. Also, in exerting the war power of the nation congress may authorize the president to prescribe coal prices, without violating the due process clause of the Fifth Amendment and an ordinance merely requiring the filing of a schedule of prices as a condition precedent to the issuance of a license to engage in the laundry business, is not violative of due process requirements. Furthermore, prices in respect of goods identified by such means as trade-marks, labels, and brands may be fixed under legislative leave by contract between the parties without violation of constitutional due process guaranties, and, although there is authority to the contrary, legislation of this character has been upheld constitutionally even where it binds third persons not parties to the contract."

See 16 C.J.S. par. 690, pages 1445-6; 11 Am. Jur. par. 282, pages 1042-3; Nebbia v. New York, 291 U. S. 502; 78 L. Ed. 940, 54 Sup. Ct. 505, 89 A.L.R. 1469; Old Dearborn Distrib. Co. v. Seagram-Distillers Corp., 299 U. S. 183, 81 L. Ed. 109, 57 Sup. Ct. 139; 106 A.L.R. 1476; West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 Sup. Ct. 578, 108 A.L.R. 1330; United States v. Rock Royal Co-Op., 307 U. S. 533, 83 L. Ed. 1446, 59 Sup. Ct. 993; Mayo v. Lakeland Highlands Co., 309 U. S. 310, 84 L. Ed. 774, 60 Sup. Ct. 517; Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381, 84 L. Ed. 1263, 60 Sup. Ct. 907; Carter v. Carter, 298 U. S. 238, 80 L. Ed. 1160, 56 Sup. Ct.

855; Olsen v. Nebraska, 313 U. S. 236, 85 L. Ed. 1303, 61 Sup. Ct. 862; Duckwork v. Arkansas, _____ U. S. _____, 86 L. Ed. 261, 62 Sup. Ct. 261.

Pertinent provisions of the contract to be enforced between the plaintiff retailer and the distributor of branded liquors are viz:

". . . the Distributor hereby agrees to sell and does offer to sell to —————————, Retailer, the brands of intoxicating liquors listed on the following pages under the caption 'Sales Price to Retailers;' and the Distributor further agrees to make the brands listed in this contract available to the Retailer for purchase so long as such brands and sizes are available for resale by said Distributor during the duration of this contract.

The Retailer, if and when he purchases any of such intoxicating liquors agrees not to resell, advertise for sale, or offer to sell such intoxicating liquors to his purchasers or consumers at a price less than that listed for each container under the caption 'Minimum Resale Price by Retailer to his Purchaser or Consumer' on the following pages of this contract, and said resale prices shall apply to all intoxicating liquors purchased prior to and on hand at the time of the effective date of said prices; and agrees not to make any refunds, discounts, concessions, gifts, or joint sales with any other article, or employ any other device which would directly or indirectly evade the minimum prices stipulated in this contract or result in a reduction of sales prices.

It is mutually agreed that the price or prices of the brands mentioned in this contract may be changed from time to time by the Distributor by an amendment

or amendments to this contract, as is provided for in Section 5, of said Chapter 21001, which provides that such change in price or prices shall not become effective until ten days after such amendment is filed with the State Beverage Department; and such changes shall become effective upon compliance by the Distributor with such law."

The necessity of the Act for the liquor industry is illustrated by the example, viz: Take a case of five year age whiskey containing 12 quarts, which constitutes three gallons. The ingredients cost 90c to manufacture and 18c per year or 90c to age for five years, making a total cost for manufacturing and ageing of $1.80 for the case. To this $1.80 must be added fixed costs of $12.00 Federal tax and $3.30 State tax on the case, all making a sub-total of $17.00. Cost of bottles, packing carton, labels, and strip stamps per case will approximate $1.50, with freight into Florida of about 40c per case, all making a cost into Florida, without any profit to anyone directly engaged in the liquor industry, of $19.00 per case. The distiller, to stay in business, must usually make a profit of $2.00 per case (less than 11% gross profit), the total of $21.00 per case. The Florida wholesale licensee, as a rule takes a mark-up on his invoice cost of 15%, or $3.15 gross profit, making a practical minimum invoice price to the Florida retail licensee of $24.15 per case. Now, it will be recalled that the cost of ingredients and ageing was only $1.80 per case so that they represent less than seven and one-half per cent of the normal invoice price to the Florida retail licensee on the typical case of liquor. So it will be seen that by reason of the high State and Federal direct taxes, there is not the margin for price cutting

on a case of five year old whiskey, invoiced to the Florida retail licensee at $24.15, as exists in other industries. In the sale of cosmetics the ingredients typically cost five cents for packing, and incidentals cost another five cents, and the face powder sells for anywhere from 25c to $2.00, depending upon the amount of advertising and class of customers to whom the powder is sold. It is said that the retail vendor of cosmetics marks up as much as 100% on invoice price to him. It is doubted that if any other industry other than the liquor industry manufactures and sells a commodity where the direct State and Federal taxes amount to anywhere near as high a percentage (over 63%) of the invoice price to the retailer. Whenever the Florida retail liquor licensee fails to obtain a fair mark-up on the invoice price to him, or sells below normal invoice cost to him, he cannot go to the Florida wholesaler and obtain further concessions, or rebates on the normal invoice price, for the practical reason the Florida wholesale distributor must pay a very heavy annual license tax, his own other operating costs and the margin just does not exist for an honest rebate or reduction of the normal retail price. Nor can the Florida wholesaler successfully pass on to the distiller the retailer's request for price abatement, for the distiller, as illustrated above, makes only a 11% profit in the transaction. If the Florida retail licensee persists in cutting prices, he is inexorably forced into bootlegging with all the attendant evils thereof, including material loss of revenue to the State.

The Legislature of Illinois enacted a statute similar to the one here under consideration. It was applicable to branded liquors. The contract contained a list of

there brands attached to and by reference made a part of the contract. The Act was challenged on the grounds that it violated the Fifth and Fourteenth Amendments to the Federal Constitution, but was upheld by the Supreme Court of Illinois, and later was appealed to, passed upon and sustained by the Supreme Court of the United States. See Old Dearborn Distrib. Co. v. Seagram-Distillers Corp., 299 U. S. 183, *supra*.

Price fixing Acts were considered by this Court in State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394; Bon Ton Cleaners & Dyers, Inc. v. Cleaning, Dyeing & Pressing Board, 128 Fla. 533, 176 So. 55; Economy Cash & Carry Cleaners, Inc. v. Cleaning, Dyeing & Pressing Board, 128 Fla. 408, 174 So. 829; Bristol-Myers Co. v. Webb's Cut-Rate Drug Co., 137 Fla. 508, 188 So. 91.

In the case of Miami Home Milk Producers Ass'n. v. Milk Control Board, 124 Fla. 797, 169 So. 541, this Court had before it the constitutionality of Chapter 17103, Acts of 1935, which created and established a Milk Control Board with power to fix the selling price of fresh fluid milk. The Act was sustained and the opinion was prepared by Mr. Justice Armstead Brown, who in part said:

"The price-fixing features of the New York statute were again considered and upheld in the case of Hegeman Farms Corp. v. Baldwin, 293 U. S. 163 55 S. Ct. 7, 179 L. Ed. 259. Statutes substantially the same as the one here in question have been upheld in several well considered State court decisions, in which the Acts were held to be legitimate exercises of the State's police powers and not in conflict with either the Federal or State Constitutions, the latter

containing provisions in their Constitutions similar to those in our own Declaration of Rights. The cases referred to are State Board of Milk Control v. Richmond Ice Cream Co. (N. J. Court of Chancery), 175 Atl. 796, decided in November, 1934; State ex rel. Board of Milk Control (N. J. Court of Errors and Appeals). 179 Atl. 116, decided in May, 1935; Reynolds v. Milk Commission of Virginia (Va. Supreme Court of Appeals), 179 S. E. 507, decided in March, 1935; Albert v. Milk Control Board (Ind. Supreme Court). 200 N. E. 688, decided March, 1936. . . .

"This Court is not bound to follow the Supreme Court of the United States when construing the provisions of our State Constitution, but we are of course bound by the decisions of that eminent tribunal construing the meaning and effect of Acts of Congress and those provisions of the National Constitution which restrict the powers of the States. . . .

"Accordingly, insofar as concerns the contention made by the appellant here that the provisions of the statute authorizing the Milk Control Board to regulate the maximum and minimum prices of fluid milk are in conflict with the due process and equal protection clause of the Fourteenth Amendment to the Federal Constitution, we are bound to hold to the contrary on the binding authority of the decision of the Federal Supreme Court in Nebbia v. New York, supra (291 U. S. 502, 54 S. Ct. 508, 78 L. Ed. 940, 89 A.L.R. 1469), being based upon a similar statute and upon a similar factual status. It follows that as against the attacks here made, the emergency statute under review is not in conflict with the provisions of the Federal Constitution referred to. . . .

"Appellant cites our recent decision in the case of State ex rel. Fulton v. Ives (123 Fla. 401, 167 So. 394) as authority for its attack upon the Milk Control Statute, but a reading of that case will show that it is not in point here. In that case we held that the Barber Board Act, which empowered the Board to fix a minimum scale of prices to be charged by barbers, by counties or in the State as a whole, was in conflict with the due process and equal protection clauses of the State and Federal Constitutions, but in the majority opinion by Mr. Presiding Justice Ellis the Nebbia case was cited and differentiated. There we were dealing with an Act regulating a comparatively small group of our population, not a basic or paramount industry, and with the price to be charged by barbers for their personal services, not as here with the price of an essential commodity of almost universal consumption."

In the case of Miami Laundry Co. v. Fla. Dry Cleaning & Laundry Board, 134 Fla. 1, 183 So. 759, involved Chapter 17894, Acts of 1937, creating and establishing a Laundry Board with enumerated broad powers, inclusive of the right to fix prices in the industry. The constitutionality of this price fixing statute was challenged on the ground that it restricted the liability of contract granted by the Constitution of Florida and the Federal Government to citizens of Florida. This Court sustained the price fixing features of the Act as against the constitutional attacks and, speaking through Mr. Justice Terrell, in part said:

"Constitutional guaranties have never been thought to be immune from regulation or limitation in the interest of the common good. When limited, the process has been evolutionary rather than spon-

taneous. Regulation might be appropriately denied today that could just as appropriately be granted tomorrow. When the exercise of a constitutional guaranty is limited to such a small sector of the population that the rights of the public will be protected by unrestricted competition, the Legislature will not generally attempt to regulate, but when large numbers become involved, many of whom are equal in the race, and their economic security becomes imperiled throught the exercise of what may appear to be the constitutional right of another, then the Legislature has not hesitated to step in and regulate. . . .

"There is no magic in the phrase, 'clothed with or affected with a public interest.' Any business is affected by a public interest when it reaches such proportions that the interest of the public demands that it be reasonably regulated to conserve the rights of the public and when this point is reached, the liberty of contract must necessarily be restricted. If the regulation involves the question of price limitation, it will be upheld unless clearly shown to be arbitrary, discriminating, or beyond the power of the Legislature to enforce. Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940; Bordens Farm Products Co., Inc. v. Ten Eyck, 297 U. S. 251, 56 Sup. Ct. 453, 80 L. Ed. 669; West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 Sup. Ct. 578, 81 L. Ed. 703; Highlands Farms Dairy v. Agnew, 300 U. S. 608, 57 Sup. Ct. 549, 81 L. Ed. 835; Miami Home Milk Producers Association v. Milk Control Board, 124 Fla. 797, 169 So. 541. See also inferences from Economy Cash and Carry Cleaners, Inc., v. Cleaning, Dyeing and Pressing Board, supra; Coleman, Sheriff v. Lichenstein, *supra;* Bon

Ton Cleaners and Dyers, Inc., v. Cleaning, Dyeing and Pressing Board, *supra*. . . .

"Courts are not authorized to adjudicate questions of public policy involved in such regulations or to conduct an inquiry into questions of fact pertaining to matters of policy, but where the Legislature has made such an investigation and determination, unless shown to be clearly arbitrary, erroneous, or unwarranted, the courts will approve them. American Jurisprudence, Vol. II, page 823.

"The Legislature is accordingly the judge of when the facts are such that a given business should be regulated under the police power or when it is affected with a public interest to such an extent as to require regulation. If the regulation enforced has some reasonable relations to the legislative purpose and is not arbitrary or discriminatory, the requirements of due process are satisfied. In its last analysis, government, regardless of the form it takes, is nothing more than an instrument to preserve an ordered society. Laws are nothing more than rules promulgated by government as a means to an ordered society. It would be strange anomaly to hold that the complexities in society had become such that the Legislature was powerless to grant appropriate relief against abuses arising therefrom."

Chapter 17894, Acts of 1937, was before this Court in the case of State ex rel. Florida Dry Cleaning & Laundry Board, 136 Fla. 528, 188 So. 836, and the opinion was by Mr. Justice BUFORD, who in part said:

"Lastly, it is contended that in the case of Miami Laundry Co., et al., v. Florida Dry Cleaning & Laundry Board, opinion filed July 27, 1938, and reported 183 Sou. 759, the Court adjudicated the provisions of

Chapter 17894, *supra,* now under attack in the Dade County Circuit Court to be constitutional and valid and that the restraining order entered in the case involved here constitutes a holding by that court contrary to the holding of the Supreme Court and is, therefore, an unwarranted exercise of judicial authority and in excess of the Circuit Court's jurisdiction."

Additional grounds for the unconstitutionality of Chapter 17894, *supra,* were presented and considered by this Court in the case of Robinson v. Fla. Dry Cleaning & Laundry Board, 141 Fla. 899, 194 So. 269, and the Court sustained the constitutionality thereof as against the grounds or reasons assigned, although Mr. Justice Brown did not participate.

The power to regulate was recognized in Mayo v. The Polk Co., 124 Fla. 534, 169 So. 41, when it was said:

"That fact that a single industry is singled out for regulation is not material. Legislative classification for this purpose may rest on narrow distinctions. Such legislation is grounded on the existence of some evil or evils to be corrected and the Legislature is generally the judge as to whether they exist and the necessity for their correction. The Act will not be held invalid merely because it fails to regulate all businesses even though they be similar in nature. Discriminations that are subject to resistance are those in which persons engaged in the same business are regulated differently or are granted different privileges under similar conditions. The rule is general that the Legislature may constitute classes for the purpose of police regulation if there is not discrimination among those similarly situated and there is otherwise a reasonable basis for the classification.

Because of the hazards and other circumstances affecting the citrus fruit industry we have reached the conclusion that the regulation and classification complained of was within the power of the Legislature to make."

The power given to an individual or board to enact reasonable rules and regulations has been sustained in Mayo v. The Texas Co., 137 Fla. 218, 188 So. 206.

It is well settled that the Legislature has the power by legislative enactment to regulate the sale of liquors. This power was conferred by the people in the general election of 1934, by the adoption of Article 19. Subsequently the Legislature has exercised that power by levying excise taxes on and by regulating its sale by licensees possessing enumerated qualifications. Other taxes and supervisory measures have been enacted. In the acceptance of a license to sell liquor at retail, the person accepts such privilege with a full knowledge of the powers vested by the Constitution, in the Legislature to enact acts for revenues and for regulations and in some areas to prohibit its sale exclusively. In State ex rel. Atlantic Ice & Coal Co. v. Weems, Director, 122 Fla. 702, 166 So. 453, it was said:

"There is no inherent right in any one to manufacture alcoholic beverages. The Constitution does not prohibit or regulate the manufacture of alcoholic beverages and it is within the power of the Legislature to prohibit or to regulate such manufacture by general or by local laws; and general laws with appropriate classifications of counties as to those in which intoxicating liquors may or may not lawfully be sold therein or as to those counties wherein State Institutions of learning or other State Institutions are or are not

located, or other classifications, may be enacted; and in a general statute entitled for regulating and taxing the manufacture, distribution and sale of alcoholic beverages, such manufacture may be prohibited in some counties and regulated in other counties for such prohibition in some counties is not actual or practical prohibition in the State, but is an element of regulation where the unit regulated is the State having many counties with varying conditions to be met."

See State ex rel. Southern Brewing Co. v. Long, 132 Fla. 450, 181 So. 421; Shelton v. Coleman, 136 Fla. 625, 187 So. 266; State ex rel. First Presbyterian Church of Miami v. Fuller, 133 Fla. 554, 182 So. 888; also 134 Fla. 212, 183 So. 726, and 136 Fla. 788, 187 So. 148; Ziffrin, Inc., v. Reeves, 308 U. S. 132, 60 Sup. Ct. 163, 84 L. Ed. 128.

The legislative intent by the enactment of Chapter 21001 was that it would be an additional regulation to be considered and construed in connection with Chapters 16774, Acts of 1935; 18015, Acts of 1937; 19301, Acts of 1939. The branded liquors referred to in Section 2 of Chapter 21001, *supra,* were for the purpose of obtaining the best liquors available, thereby protecting the health of the people, and by prescribing the minimum prices for the retail trade, financial losses would not occur to those so engaged and thereby establishing financial stability and permanency in supplying a wholesome, reputable grade of liquors to the consuming public. The Acts add security and permanency to the source of income or revenues arising thereunder and going to the State of Florida. It is clear that these several objectives in the form of regulations were within the power of the Legislature to enact.

Having reached the conclusion that the Act is constitutional as against the several attacks made, we therefore decline to pass upon or decide the remaining question of venue as raised by the petitioner.

It follows that the learned chancellor below applied the improper principle of law and for this reason the petition for writ of interlocutory certiorari is granted and the two challenged orders hereby quashed.

It is so ordered.

BROWN, C. J., WHITFIELD, and TERRELL, JJ., concur.

BUFORD, THOMAS and ADAMS, JJ., dissent.

### ON REHEARING GRANTED

BUFORD, J.:

On the original disposition of this case the present writer dissented from the majority opinion but wrote no opinion expressing his views in regard to the issue presented.

The case is now before us on Rehearing granted and it is my view that the certiorari should be quashed, for the following reasons: Section 2 of the Act here under consideration, inter alia, provides:

"Fair Trade Contracts, Minimum Resale Prices, Provisions, Concerning.—No distiller, rectifier, blender, distributor or vendor, or anyone for them, who holds a license in this State to sell intoxicating liquors, as defined in Section 5 of Chapter 16,774, Laws of Florida, 1935, and any and all amendments thereto, which bears a trade mark, brand, label, or name of the producer or owner and which is in fair and open competition with commodities of the same general class produced by others, shall offer any intoxicating

liquors for sale in this State in any manner or at all without complying with the provisions of this Act.

"All intoxicating liquors sold in this State by any licensee, licensed to distribute intoxicating liquors, must be sold according to a fair trade contract, and each such licensed distributor shall file with the Beverage Department a complete list of all intoxicating liquors offered for sale which list shall indicate minimum resale prices on all intoxicating liquors according to the size of containers in which sold and in addition thereto such distributor shall file with the Beverage Department all minimum resale price changes as they shall occur from time to time which such price list and changes thereto shall constitute a fair trade contract under this Act and as provided in Chapter 18395, Laws of Florida, 1937; Chapter 19201, Laws of Florida, 1939, and any and all amendments thereto, which fair trade contracts must provide the following minimum resale prices:

"(a) On all sales from licensees, licensed to distribute intoxicating liquors to licensed vendors, a minimum mark-up resale price for said licensed vendor of not less than forty (40%) per cent, provided that thirty-nine (39%) per cent minimum mark-up resale price is allowable herein in order that the retail selling price be established at a twentieth part of a dollar instead of an odd cents price.

"(b) All minimum mark-up resale prices shall be calculated and based on the actual prices to the licensed vendor, plus transportation charges and Federal and State taxes."

So it is that the Act in the very beginning provides that each licensed distributor shall file with the Beverage Department a complete list of all intoxicat-

ing liquors offered for sale, which list shall indicate minimum resale price at which intoxicating liquors according to the size of containers in which sold, and in addition thereto such distributor shall file with the Beverage Department all minimum resale prices changed as they shall occur from time to time which such price list and charges thereto shall constitute a fair trade contract.

Now under this provision "A", being a distributor, may determine for himself at what price he will sell Seagram's AAA Whiskey and advise the Beverage Department his minimum price on that brand of whiskey. Distributor "B" may determine that he will sell that same brand of whiskey at another price and file with the Beverage Department his minimum price on that brand of whiskey. If distributors "A" and "B" both sell to vendor "X", vendor "X" must add 40% to the price of the liquor purchased from "A" and 40% to the price of the liquor purchased from "B". So it is that the Act provides no uniformity of price.

On the other hand, a half dozen distributors, being all of the distributors in one trade area, may get together and fix the resale price on Seagram's AAA whiskey at whatever they determine the traffic will bear and thereby require the vendors in that trade area to get the price fixed by the combination of distributors plus 40%.

So it is that the fixing of the retail price under the terms of this Act is not left within the power of any State Board or instrumentality, nor is it fixed by the legislature, but is left entirely to the determination of the distributor.

The only power in any State Agency is that conferred upon the Beverage Department to see to it that those prices fixed by the distributors are enforced. This provision alone is enough to condemn the Act as being unconstitutional and void.

But we shall go a little further. The property right of the trade mark owner is not only unprotected but is distinctly violated by the provision of this Act. It is uniformly recognized that the trade mark owner has a property right which he may protect by contract and it has been held that this property right (good will) may be protected as against one who deprives him of the benefits resulting from the same. See Old Dearborn Distilling Co. v. Seagram-Distillers, 299 U. S. 183, 81 L. Ed. 109, 106 A.L.R. 1476.

It also appears to be the law of the land that a fair trade Act in this regard can not be maintained as valid, except where the Act provides for the making of voluntary contracts between the producer and trade mark owner on the one hand and the distributor on the other. Such was the rationale of the opinion in the Seagram-Distillers case, supra. See also Waco Products Co. v. Reed Drug Co., 225 Wis. 474, 274 N.W. 426, 125 A.L.R. 1346.

So far as we have been able to find, no statute has been upheld which attempted to compel the producer of a trade-marked commodity to enter into contracts with retailers fixing retail prices. Nor do we think that such provision could be upheld because it is contrary to the due process and equal protection clause of both State and Federal Constitutions. This is not all. Price fixing Acts have been upheld only upon the theory that such may be resorted to to protect the interest of the public and to prevent destroying com-

petition in businesses or vocations, the success of which is materially infected with public interest. In other words, the subject matter to which the price fixing applies must be one which the public interest demands be kept in operation and functioning without monopolistic control. See Commonwealth of Penn. v. Zasloff, 3A (2) 67, 128 A.L.R. 1120; Fairmont Creamery Co. v. Minn. 274 U. S. 1, 47 Sup. Ct. 506, 71 L. Ed. 893, 52 A.L.R. 163; Nebbie v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940; Fla. Dry Cleaning & Laundry Board v. Everglades Laundry, 137 Fla. 290, 188 Sou. 380; Miami Home Milk Producers' Ass'n. v. Milk Control Board, 124 Fla. 797, 169 Sou. 541.

Nor do these constitute all the reasons why this Act is void. There is not one thing in the Act to indicate that there was any legislative finding that any necessity existed for the terms of the Act; nor is there any power or authority vested in any Board to make any finding of fact in regard thereto. No hearing is provided for; no due process of law is contemplated, all of which are certainly necessary to make a price fixing Act valid. See Miami Laundry Co., et al., v. Fla. Dry Cleaning & Laundry Board, 134 Fla. 1, 183 Sou. 759.

It is contended that merely because Section 2 of Article XIX of the Constitution provides that:

"The power of the legislature to provide necessary laws to carry out and enforce this Article shall include the right to provide for manufacture or sale by private individuals, firms and corporations or by the State or by counties, cities or political subdivisions, or by any governmental commissions or agency to be created for that purpose."

Chapter 21001 is within the purview of the Constitution. We think that this provision of the Constitu-

tion must read in pari materia with other parts of the Constitution and that if the legislature, as it did in the enactment of Chapter 21001, fails to provide for due process of law or fails to provide equal protection of the law or exercises its power in an arbitrary and otherwise unconstitutional manner, then the provisions of Article XIX of the Constitution can not serve to give such Act validity. We are not concerned with the policy of legislative Acts and, therefore, do not comment on the policy of this Act. To determine what legislative policy was behind the Act we are left to roam in the realm of guess work because, as hereinbefore stated, there is no finding of fact expressed in the Act as a basis for its enactment. Nor is there any power lodged in any State Agency to determine any fact which would warrant its enforcement; nor is there the fixing of any retail price to the consumer, either fixed by the legislature or provision made for its fixing by a State agency. The individual distributor or a combination of distributors of intoxicating liquors may fix the price at which it, or they, will sell to the retailer and the Act provides that the retailer must after adding the Federal and State tax mark up the retail price to include at least 39% profit with the only power in the State agency, the Beverage Department to see that prices based on the price fixed by the distributor, or distributors, is enforced; all of this regardless of the right of the owner of the trade mark under which the liquors are manufactured and sold to, by contract or otherwise, control or protect his property right in the trade mark; also without any showing or finding that the public interest demands the successful operation of the liquor business and without any showing or finding that the arbitrary

minimum profit of 39% is essential to the successful operation of a retail liquor business, both in thickly populated centers and in sparsely populated communities.

If we assume that the consumption of intoxicating liquor is contrary to the promotion of health and good morals, and that the provisions of the Act by insuring a high price for such liquor will tend to reduce the consumption, we are then faced with the fact that the reduction of consumption will necessarily reduce the State's revenue derived from sales. To increase the State revenue from sales is the policy of the State established by legislative tax Acts in this regard. Probably the public health and morals would be better conserved by there being no available supply of intoxicating liquors for beverage purposes but our Constitution, Article XIX, establishes a contrary policy. So there is nothing in this Act which indicates that it is intended either to promote health, safety or morals or to promote State or public welfare.

The Act upon its face is one not designed to effect the public health, safety or welfare, but is designed solely for the protection of the wholesale liquor dealer by allowing him to control the retail prices so that his customers may be forced to sell liquor at a substantial profit, if they can sell it at that profit in competition with the bootlegger, and thereby make the wholesalers' collections more secure.

Certiorari heretofore granted is quashed and the order of the Circuit Court is affirmed.

BROWN, C. J., TERRELL, THOMAS, and ADAMS, JJ., concur.

WHITFIELD and CHAPMAN, JJ., dissent.

**WHITFIELD, J., dissenting:**

The Constitution does not require the legislature to make findings of facts before it can enact statutory regulations under the sovereign police power of the State to regulate the sale of intoxicating liquors, wines or beer. It is a universal rule that statutory regulations so enacted are valid if there is any conceivable basis therefor within the lawmaking power. The Constitution expressly provides that "the power of the legislature to provide necessary laws to carry out and enforce this Article (XIX as amended in 1934 relating to the manufacture and sale of intoxicating liquors, wines or beer) shall include the right to provide for manufacture or sale by private individuals, firms and corporations" etc. "The power" and "the right" thus specifically conferred upon the legislature are not controlled by other statutes and are without express or general limitations affecting the matters in controversy. The implied controlling organic limitations of due process and equal protection of the laws should be enforced. But violations of such implied controlling limitations should be made to appear and not assumed, to warrant judicial nullification of statutory regulations of the sale of intoxicating liquors, wines or beer, enacted under "the power of the legislature" which "shall include the right to provide for manufacture or sale" of "intoxicating liquors, wines or beer," that is specifically conferred upon the legislature by amended Article XIX of the Constitution.

CHAPMAN, J., concurs.

**CHAPMAN, J., dissenting:**

Ground One of the petition for rehearing points out that Chapter 21001, Acts of 1941, Laws of Florida, is

a radical departure from the established principles controlling the powers of a sovereign state to fix the price of a commodity in that power to fix the prices of intoxicating liquors by the terms of the Act is conferred upon a private individual rather than a board or group of individuals, and that the wholesalers or distributors, by the terms of the Act, have no voice in setting the price to be obtained for their liquors and for these reasons the decision in the case at bar is erroneous.

The answer to this contention is: (1st) The power to regulate the sale of intoxicating liquors is vested in the Legislature. The power was exercised, in part, by the Legislature in the enactment of Chapters 16774, Acts of 1935; 18015 Acts of 1937; 19301 Acts of 1939; and 21001 Acts of 1941. See Article XIX of the Amendment to the Florida Constitution adopted at the General Election on November 6, 1934. It is true that liquor is property and protected as such law, but its sale is regulated by law. The health, welfare, safety and protection of the people classify it as a commodity impressed with a public interest and by law to be regulated. Other forms of business, in part, which can or may be regulated by law are viz: The banking business, insurance, stock yard business, tobacco warehouses, innkeepers, cotton gins, mills, water, steam heat, railroad, electricity, gasoline, milk, and others. See State ex rel. Atlantic Ice & Coal Co. v. Weems, Director, 122 Fla. 702, 166 So. 453.

(2nd) It cannot be said that an Act is *per se* arbitrary, discriminatory and unreasonable when a department of the state government is authorized to fix and enforce the sale prices of intoxicating liquors so as to establish stability of the business or com-

modity regulated, prevent failures, provide revenues and regulate its sale to the public. 16 C.J.S. 1444, par. 690, on this point says:

"While the right of an owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, safeguarded by the due process clauses of the Fifth and Fourteenth Amendments, as well as similar provisions in state constitutions, such provisions, generally speaking, simply protect an individual or business from price regulation which is arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt. Accordingly, due process guaranties are not violated by the legislature or its agencies, when, in the proper exercise of its police power, or for the general welfare, or where the business or property involved is affected with a public interest, although of a private character, it promulgates reasonable regulations of prices, rates and charges, including legislation requiring that the rates or charges shall be reasonable in amount and without discrimination, as well as enactments fixing rates and charges, and superseding rates previously fixed by contract, or delegating such power to a commission. . . ."

(3rd) The petition represents that the enforcement of the terms of the Act will cause an increase in the price of liquors, encourage the activities of bootleggers, decrease the present revenues, and promote the evils usually attending the unlawful sale of liquors. It is settled that this Court, in construing an Act, will consider its history, the evils to be corrected, and the intention of the lawmaking body. See Curry v. Lehman, 55 Fla. 847, 47 So. 18; Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157. The reasons

actuating the Legislature in enacting the measure and the wisdom or folly thereof cannot here be considered. These several contentions were for consideration by the Legislature and not by this Court.

(4th and 5th). It is contended that the terms of the Act invade the constitutional rights of the licensee owner and retailer of the liquors in that he is deprived of the prerogative of fixing the price thereof; that the ownership of the liquors and price fixing prerogatives of the State Beverage Department under the Act destroy the owner's property right in contravention of the fundamental law; and that the 39% profit essential to the liquor traffic is arbitrary legislation. A retailer of intoxicating liquors accepts his license, opens his saloon, and transacts business with a knowledge of the power of the Legislature to enact laws incident to regulating the same. The right of a state to regulate a business is a continuing one, as a business lawful today may in the future, because of changed conditions, require additional regulations, and certainly this is true as to a business affected with a public interest. Persons and property are subject to restraints and burdens under the police power. See City of Miami Beach v. The Texas Co., 141 Fla. 616, 194 So. 368; 11 Am. Jur. page 1006, par. 27.

Grounds 6, 7, 8, and 9 of the petition for rehearing have been carefully considered. Our attention has not been directed to any authority or reasons offered that justify a change of our original opinion.

WHITFIELD, J., concurs.