Plaintiff, Continental Distilling Corporation, brought its injunction suit at Tampa, Florida. The chancellor overruled the several motions by defendants, Liquor Stores, Inc., and Webb's City, Inc., to dismiss plaintiff's bill. The defendants-petitioners now seek a review of such order by certiorari.
The bill alleges that Continental Distilling Corporation is the maker, manufacturer and distributor of whiskies, and in particular is the manufacturer, distiller and owner of the trademark, brand and name of a whiskey known as "Philadelphia Blended Whiskey," which is sold to various wholesalers and retailers throughout Florida and the United States; that the plaintiff-respondent, termed the "owner" entered into a contract with two retail concerns in Jacksonville, Florida, termed the "retailer," who are not parties to the suit, which contract, among other things, provided: "Retailer shall not, directly or indirectly, at any time, offer for sale or sell within Florida any of said beverages which Retailer has heretofore purchased, now has on hand, or may hereafter purchase or otherwise in any way acquire, and which bear, or the labels or containers of which bear, any trademark, brand name, insignia or the name of the said Continental Distilling Corporation, at other than the resaleprices therefor to consumers in Florida, or at any other than the terms and conditions of such resales, from time to timedesignated by Owner; and Owner shall have the right at all times, and from time to time to revise or change any and all such resale prices and terms and conditions of resale, any such revisions or changes to become effective on such date as shall be specified by Owner on not less than two days' prior written notice mailed to Retailer, postage paid, to Retailer's address as herein stated. Such resale prices and terms and conditions of resale shall be in accordance with written schedules furnished from time to time to Retailer by Owner and/or Owner's wholesaler in Florida authorized for the purpose, and such schedules shall constitute a part of this agreement; and at all times the schedule last delivered to Retailer pursuant to this agreement shall govern the resale prices and terms and conditions of resale to consumers. Owner may from time to time list additional goods and brands in any such schedule; with designated resale *Page 377 
prices and terms and conditions of resale to consumers, and all the provisions of this agreement shall apply to any and all such additions." (Italics supplied.)
And by Paragraph 6 the bill further alleges: "6. That pursuant to the requirements of Chapter 541, Florida Statutes, Ann., 1941,your complainant established the minimum resale price of `Philadelphia Blended Whiskey' of $4.10 per one-fifth gallon to be charged by all retailers selling direct to the consumers throughout the trade area comprising the State of Florida, which minimum price so established by your complainant is in effect throughout the State of Florida; that on September 1, 1947, October 20, 1947, and March 5, 1948, your complainant addressed to each retail whiskey dealer in the State of Florida a letter advising such dealers that the minimum retail price of `Philadelphia Blended Whiskey' to be charged by them in the retail sale of said whiskey, was the sum of $4.10 per one-fifth gallon, which letters, so addressed and containing the minimum price to be charged for the whiskey above mentioned, were sent through the usual course of the United States mail to the retail whiskey dealers throughout the State of Florida, including the defendant, Liquor Stores, Inc., 812 South Boulevard, Tampa, Florida. (Italics supplied.)
The bill further charged that Liquor Stores, Inc., has violated such agreement by advertising and selling "Philadelphia Blended Whiskey" at $3.49 per fifth, when the price fixed by plaintiff-respondent was $4.10 per fifth, and that the acts and doings of Liquor Stores, Inc., are:
"* * * contrary to the expressed provisions of Chapter 541, Florida Statutes, Ann., 1941 [F.S.A.], and is resulting in irreparable injury and damage to your complainant in the following respects:
"(a) The good will established by complainant through the expenditure of substantial sums of money in advertising its product under the trademark, brand and name of `Philadelphia Blended Whiskey' is being destroyed.
"(b) Other retail liquor dealers who are selling your complainant's products at prices not less than the minimum retail sales price heretofore set and established by your complainant
in accordance with the `Fair Trade Act' would be compelled to violate their agreements with your complainant and be compelled to violate the Fair Trade Act by selling your complainant's products below the minimum retail sale price in order to meet the unfair competition created by the acts of the defendant. (Italics supplied.)
"(c) The cutting of prices by the defendant below the minimum retail sales price will cause the public and consumers to believe that your complainant's products, including `Philadelphia Blended Whiskey,' is not worth the uniform minimum retail sales price, in consequence of which said retailers will be unable to sell your complainant's products bearing its trademark, brand and name at the minimum sales price so set and established.
"(d) The public will become confused as to the various brands of such products being sold in open competition with the products distilled and manufactured by your complainant and bearing complainant's trademark, brand and name. * * *"
After the commencement of the suit against Liquor Stores, Inc., the petitioner, Webb's City, Inc., was allowed to intervene as a defendant, who, like Liquor Stores, Inc., appears not to have signed any price fixing contract with the plaintiff-respondent.
The plaintiff-respondent predicates its right to an injunction upon a law enacted in 1939, which is now Chapter 541, F.S. 1941, F.S.A., and known as the "Florida fair trade law," containing provisions relative to price fixing, as follows:
"541.03. Contract may govern price of sale or resale
"No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Florida by reason of any of *Page 378 
the following provisions which may be contained in such contract:
"(1) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.
"(2) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.
"(3) That the seller will not sell such commodity:
(a) To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or
"(b) To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price." Section 541.03, F.S. 1941, F.S.A.
"541.05. Owner alone may establish resale price
"No minimum resale price shall be established for any commodity, under any contract entered into pursuant to the provision of this chapter, by any person other than the owner of the trade-mark, brand or name used in connection with such commodity or a distributor specifically authorized to establish said price by the owner of such trade-mark, brand or name." Section 541.05, F.S. 1941, F.S.A.
"541.07. Suit at law for violation of chapter.
"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this chapter, whether the person so advertising, offering for sale or selling is or is not a party to such contract, and whether the particular lot of such commodity so advertised, offered for sale or sold, was or was not at any time sold to a party to a contract that stipulated the price of such commodity under the provisions of this chapter is unfair competition and is actionable at the suit of any person damaged thereby." Section 541.07, F.S. 1941, F.S.A.
After the enactment during the early and middle '30s by the various states of laws similar to Chapter 541, F.S. 1941, F.S.A., the Federal law was amended as stated in American Jurisprudence, as follows: "Following the pattern of the state legislatures, the Congress of the United States in 1937 enacted a similar statute, commonly referred to as the Miller-Tydings Act [15 U.S.C.A. § 1], by way of amendment to the Sherman Anti-Trust Act [15 U.S.C.A. §§ 1-7, 15 note], declaring in effect that the fixing by agreements of the minimum resale price of such commodities shall not be deemed unlawful by reason of anything contained in the Sherman Act, whenever such agreements are lawful where the resale is made." 52 Am.Jur. — Trademarks, Tradenames, etc., Sec. 177, p. 649.
The statutes relative to price fixing by producers and distributors are applicable only to the commodity as it flows into commerce from producer or distributor to the ultimate consumer through the retailer, and do not relate to cross-agreements between producers or distributors of commodities. "The statute does not legalize horizontal price-fixing agreements entered into between the same class of persons, such as between manufacturers, or between wholesalers or under state and Federal anti-trust acts. The only resale price maintenance permitted by the act is vertical, that is, by agreements entered into between a producer or manufacturer or wholesaler on the one hand and the retailer or other intermediate handler in a straight vertical line on the other. The law does not authorize cross-agreements between competitors, and whatever agreements are permitted all face one way." Id. Sec. 180, p. 651.
The agreements made unlawful and above referred to are termed "horizontal" agreements, but "vertical" agreements by the producer or distributor, or as by him authorized for "price fixing", are made *Page 379 
lawful, and also the sale below the stipulated price is termed "unfair competition" and actionable. See Chapter 541, F.S. 1941, F.S.A.
The true legislative intent and purpose of Chapter 541, F.S. 1941, F.S.A. was to permit price fixing by the producers and distributors of the identified commodities, as follows:
Section 541.03, supra, provides that contracts relating to sale or resale of the identified goods shall not be "deemed in violation of any law" by reason of any provision:
"(1) That the buyer will not resell * * * at less than the minimum price stipulated by the seller.
"(2) That the buyer will require of any dealer to whom he may resell * * * that he will not, in turn, resell at less than
the minimum price stipulated by the seller.
"(3) That the seller will not sell such commodity:
"(a) To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use andat not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or
"(b) To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not lessthan the stipulated minimum price."
Section 541.04 prescribes that "for the purpose of preventing evasion of the resale price restrictions imposed" by contract certain specified acts "shall be a violation of such resale price restrictions."
Section 541.05 specified that "no minimum resale price" shall be established except by "the owner of the trade-mark, brand or name used" or by a "distributor specifically authorized to establish said price by the owner of such trade-mark, brand or name."
Section 541.07 prescribes that it "is unfair competition" for anyone to willfully and knowingly advertise for sale or to sell such identified goods "at less than the price stipulated inany" (price fixing) contract entered into pursuant to the provisions of this chapter "whether the person so advertising, offering for sale or selling is or is not a party to such contract, and whether the particular lot of such commodity so advertised, offered for sale or sold, was or was not at any time sold to a party to a contract that stipulated the price of such commodity."
Statutes relating to and prohibiting sales of commodities below cost in certain cases have been enacted and entitled: "Unfair Sales Act," "Unfair Practice Act," and "Fair Sales Act," but we are not now concerned with such a regulation of competition.
The U.S. Supreme Court, in reviewing in the Dearborn-Seagram case a decision of the Supreme Court of Illinois upholding the validity of a similar act under the circumstances then presented, in conclusion stated: "But it is unnecessary to pursue the subject further; for, since the sole purpose of the present law is to afford a legitimate remedy for an injury to the good will
which results from the use of trademarks, brands, or names, it is obvious that its provisions would be wholly inapplicable to goods which are unmarked." (Italics supplied.) Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 198, 57 S.Ct. 139, 146, 81 L.Ed. 109, 106 A.L.R. 1476. And observed, as to relief by the U.S. Supreme Court, that: "There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in *Page 380 
that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned." (Italics supplied.) Id., 299 U.S. text 195-196, 57 S.Ct. at page 145. And thereby gave weight to the statement found in American Jurisprudence as follows: "It has also stated that the action of a State legislature in enacting a police regulation attacked as unreasonable, and of the highest court upholding its validity, indicates the existence of evils for which it is an apparent appropriate remedy." 11 Am. Jur. p. 1080, Sec. 304, citing O'Gorman Young v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.
Public policy of Florida in re price-fixing. — Agreements and contracts tending to fix prices and restrain trade have been unlawful in this State since it became a state. At present Sections 542.01-542.11, F.S. 1941, F.S.A., provide that combinations, confederations and agreements to fix or maintain prices or commodities tending to preclude free and unrestricted competition in the sale of such commodities are made criminal offenses and such agreements are declared invalid and offending the public policy of the sovereign State of Florida, and that the offenders should be subject to fine and imprisonment.
It is further provided by law that: "Any contract or agreement in violation of the provisions of this chapter shall be void and not enforceable either in law or equity." Section 542.10, F.S. 1941, F.S.A. The foregoing statute governing intrastate commerce of Florida corresponds to the Sherman Anti-Trust Act of the Federal Statutes, relating to interstate commerce.
Unfair discrimination has been prohibited in this State since 1915, and the present provisions are:
"540.01. Unfair discrimination and competition prohibited "Any person doing business in the State of Florida, and engaged in the production, manufacture, sale or distribution of any commodity in general use, that shall, for the purpose of destroying the business of a competitor in any locality, discriminate between different sections, communities, or cities of this state by selling such commodity at a lower rate in one section, community or city, than is charged for said commodity by said party in another section, community or city, after making due allowance for the difference, if any, in the grade or quality and in the actual cost of transportation from the point of production, if a raw product, or from the point of manufacture, if a manufactured product, shall be deemed guilty of unfair discrimination, which is declared unlawful." Sec. 540.01, F.S. 1941, F.S.A.
"540.06. Unfair commercial discrimination prohibited; penalty:
"Any person, firm, company, association or corporation violating any of the provisions of § 540.01, and any officer agent or receiver of any firm, company, association or corporation, or any member of the same, or any individual, found guilty of a violation thereof, shall be fined not more than five thousand dollars or be imprisoned in the county jail not to exceed one year." Sec. 540.06, F.S. 1941, F.S.A.
The foregoing sections of Ch. 540., F.S. 1941, F.S.A., relating to intrastate commerce of Florida, correspond to the Robinson-Patman Act of the Federal Statutes, 15 U.S.C.A. §§ 13, 13a, 13b, 21a, relating to interstate commerce, as stated in American Jurisprudence, as follows: "A Federal statute known as the Clayton Act [15 U.S.C.A. §§ 12-27], as amended in 1936 by an enactment known as the Robinson-Patman Act, prohibits discrimination between purchasers in respect of the price of commodities marketed through the channels of interstate or foreign commerce, where the effect of such discrimination would be to lessen, injure, or destroy competition or tend to create a monopoly." 52 Am.Jur., Trademarks, Tradenames, etc., Sec. 175, p. 645.
To hold Ch. 541, F.S. 1941, F.S.A., valid would be to say to the petitioners that horizontal agreements and contracts fixing prices or tending to stifle competition are void, as against public policy, and bind no one, and that those who execute them may be prosecuted criminally and subjected to fine or imprisonment and, if a foreign corporation, denied the right to do business in this State or, if a domestic corporation, charter forfeited; however, in respect to the same commodities, that vertical contracts or agreements fixing prices or tending *Page 381 
to stifle competition are not only valid and binding on the parties who execute the contract and also upon all who are advised or informed as to the price fixed by the producer or distributor; and, furthermore, he who stifles competition by vertical price fixing may procure the courts to aid him in doing so.
Chapter 541, F.S. 1941, F.S.A., purports to authorize price fixing in the vertical plane of branded or trademarked goods by producers or distributors, but all price fixing of commodities in the horizontal plane is illegal and criminal. See Ch. 542, F.S. 1941, F.S.A.
Section 541.07, supra, specifies that it shall be unfair competition for the retailer-vendee to sell the identified goods for less than the price fixed by the distributor-vendor when the retailer in fact is not a competitor of the producer or distributor, but his patron, either directly or indirectly, and, according to the bill of complaint, the plaintiff is not suffering from any competition between it and the retailer but only because the retailers are in competition between themselves as to a commodity which it once owned and as to a commodity in which it now has no property interest.
It is true that the commodity in question may bear the trademark, brand or trade name of the plaintiff and it is recognized that trademarks, trade names and brands are utilized to promote good will for the purpose of inducing sales, but once the product is sold, with the trade name, trademark or brand on the commodity, then the purchaser becomes the owner of the commodity with the trademark, trade name or brand attached and apart of it, and the producer or distributor no longer retains what he has sold, and the purchaser is entitled to what he has bought, to be dealt with by him as granted by Sections 1 and 12 of the Declaration of Rights and of the Florida Constitution, subject only to the proper exercise of the State and Federal police power in the protection of the property right which the owner of a trademark, trade name or brand may have in franchises, or privileges otherwise conferred by law.
The Supreme Court of the United States recognized that vertical price control was in restraint of trade, as restated in the headnote, as follows: "A system of contracts between manufacturers and wholesale and retail merchants by which the manufacturers attempt to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail whether purchasers or subpurchasers, eliminating all competition and fixing the amount which the consumer shall pay, amounts to restraint of trade. * * *" Dr. Miles Medical Co. v. John D. Park Sons Co. 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502.
And in reference to the effect as a restraint of trade, the opinion by Chief Justice Hughes stated:
"But agreements or combinations between dealers, having for their sole purpose the destruction of competition and the fixing of prices, are injurious to the public interest and void. They are not saved by the advantages which the participants expect to derive from the enhanced price to the consumer. * * *
"The complainant's plan falls within the principle which condemns contracts of this class. It, in effect, creates a combination for the prohibited purposes. No distinction can properly be made by reason of the particular character of the commodity in question. It is not entitled to special privilegeor immunity. It is an article of commerce, and the rules concerning the freedom of trade must be held to apply to it, nor does the fact that the margin of freedom is reduced by the control of production make the protection of what remains, in such a case, negligible matter. And where commodities have passed into the channels of trade and are owned by dealers, the validity of agreements to prevent competition and to maintain prices is not to be determined by the circumstance whether they were produced by several manufacturers or by one, or whether they were previously owned by one or by many. The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic." (Italics supplied.) Dr. Miles Medical Co. v. John D. Park Sons Co., supra, 220 U.S. text 408-409, 31 S.Ct. at page 384. *Page 382 
Justice Hughes further stated in the Dr. Miles Medical Co. case that: "The essential features of such a system are thus described by Mr. Justice Lurton (then circuit judge), in the opinion of the circuit court of appeals in the case of John D. Park Sons Co. v. [Samuel B.] Hartman, 6 Cir., 153 F. 24 [42], 12 L.R.A., N.S., 135: `The contracting wholesalers or jobbers covenant that they will sell to no one who does not come with complainant's license to buy, and that they will not sell below a minimum price dictated by complainant. Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to anyone who proposes to sell again unless the buyer is authorized in writing by the complainant and not to sell at less than a standard price named in the agreement. Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable. Thus a combination between the manufacturer, the wholesalers, and the retailers, to maintain prices and stifle competition, has been brought about." Dr. Miles Medical Co. v. John D. Park Sons Co., supra, 220 U.S. text 399-400, 31 S.Ct. at page 381.
The vertical price fixing by the distributor, arrived at by contract and independent of any statute dealt with by the Dr. Miles-Park Case, was condemned because such acts stifled competition and thereby were injurious to the public interest and void. With the aid of Ch. 541, F.S. 1941, F.S.A., there would be little or no difference in the ultimate effect upon the public under the Dr. Miles-Park contract and under the distiller's contract; the effect upon the public of price fixing agreements is the same whether they be with or without the aid of a statute.
The Florida Fair Trade Act provides, Sec. 541.03, F.S. 1941, F.S.A.: "No contract relating to the sale or resale of a commodity which bears or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which commodity is in free and opencompetition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Florida by reason of any of the following provisions which may be contained in such contract." (Emphasis supplied.)
In the case of Scarborough v. Webb's Cut Rate Drug Co.,150 Fla. 754, 8 So.2d 913, 921, we said that price fixing may be sustained on the following basis: "So far as we have been able to find, no statute has been upheld which attempted to compel the producer of a trademarked commodity to enter into contracts with retailers fixing retail prices. Nor do we think that such provision could be upheld because it is contrary to the due process and equal protection clause of both State and Federal Constitutions. Const.Fla. Declaration of Rights, §§ 1, 12; Const.U.S.Amend. 14. This is not all. Price fixing Acts have been upheld only upon the theory that such may be resorted to toprotect the interest of the public and to prevent destroyingcompetition in businesses or vocations, the success of which ismaterially affected with public interest. * * * (Emphasis supplied.)
The purpose of such price fixing then was to prevent ruinous competition. Price fixing is legal when it is to the public interests and is accomplished by lawful means. Such competition can exist only in times of over-production, resulting in cutthroat competition for the available potential markets. It was not contemplated by the Legislature of 1939 that this Act would operate in periods of scarcity of consumer goods when there were not enough consumer goods to satisfy the demands of the public, with the same effect as in periods of over-production and abundance.
It is well recognized that a law under one state of facts may be reasonable but under another state of facts may be unreasonable. The public need of the Unfair Competition Act during the early and middle '30s reflects reasonableness, and they do not appear so unreasonable for those times. These so-called Fair Competition Acts were enacted during the *Page 383 
'30s and began in California in 1931, during a period when the entire United States was undergoing one of the most severe and prolonged depressions that the country had ever experienced, with a deflated currency as relating to purchasing power; when the inventories of the wholesale and retail merchants were high, the factories were idle, and unemployment of labor was great; and when credit policies had become restricted, all of which had resulted in an economy of abundance of goods and an economy of scarcity as to purchasing power; with many bankruptcies occurring and with business generally operating with a fear of bankruptcy and with the banking situation becoming so serious that the President called closed all of the banks in one day and allowed only the reopening of such banks as were liquid enough to withstand runs. Conditions then were such that, in order to remedy the imbalance between commodities and purchasing power, pigs were killed and cotton and corn were plowed under; that grain was at times used by the producers for fuel instead of being sold at the market price. It was a time when the maxim that "competition is the life of trade" had been supplanted by the term "ruinous competition" because of the general down-trend of prices, which was resulting in retail sales below cost.
"In a recent case the U.S. Supreme Court has held that the reasonableness of the exercise of the police power of the state must be considered in the light of the current economic conditions." 11 Am.Jur. 1080, citing West Coast Hotel Co. v. Parrish, 1936, 300 U.S. 379, 57 S.Ct. 578, 585, 81 L.Ed. 703, 108 A.L.R. 1330.
In the Parrish case, supra, the U.S. Supreme Court, per Justice Hughes, stated:
"We may take judicial notice of the unparalleled demands for relief which arose during the recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved. It is unnecessary to cite official statistics to establish what is of common knowledge through the length and breadth of the land. While in the instant case no factual brief has been presented, there is no reason to doubt that the state of Washington has encountered the same social problem that is present elsewhere."
The Florida Fair Trade Act wisely provided that before anyone could enforce that Act as against another, certain conditions must exist. Those conditions are: (1) There must be competition
between producers or manufacturers of the same general commodity; and (2) that competition must be free and open.
The present conditions are now somewhat reversed as to those of 1939 and most of the preceding ten years. We now have a dearth of goods where we had an abundance in the '30s; and we have money without purchasing power, where money had a high purchasing power during the '30s. As under those conditions the fixing of a minimum sales price was considered within the police power of the State, the fixing of maximum sales price might now be considered within the police power, e.g., OPA.
It is common knowledge that the world in 1945 emerged from a long drawn out conflict, resulting in acute shortages in many items of commerce. The demand for some of those items has not yet been saturated by over-supply. So long as the prerequisiteconditions of free and open competition as to the particular commodity do not exist, any contract attempted to be made under the provisions of the Fair Trade Act is void, as being contrary to public policy. It cannot be successfully contended that competition exists in a particular product when there has been a shortage of that product over a period of years and that shortage has not yet been overcome. It is not in the public interest that the Florida Fair Trade Act should be enforced on behalf of any manufacturer of a product in which there is no competition or in which the competition is not free and open as to price.
Those who attempt to enforce the provisions of this or any other Act of the Legislature must allege and prove that all prerequisite conditions have been complied with or that these conditions exist for the effective operation of the statute. It becomes necessary therefore for plaintiff to allege and prove not only that there *Page 384 
was a contract but also as to the commodity in question, that there was free and open competition. That is a factual element that must be established before the contract may become effective, and before it may be enforced.
A producer or distributor may, by price fixing to remove competition between retailers as to "price" of a commodity, effectively remove such commodity from the status of "free and open" competition of the market as to market price. Under present conditions, contracts fixing a minimum sales price of commodities involved in the vertical or horizontal plane would be considered as a restraint upon free and open competition unless the contrary is shown.
Relative to classification, the U.S. Supreme Court, in the Hartford-Harrison case, held that a statutory discrimination between the mutual companies and the stock companies which write fire, casualty, etc., insurance in the State, forbidding stock companies to act through agents who are their salaried employees but permitting this to mutual companies, is repugnant to the equal protection clause of the Fourteenth Amendment, and that:
"The applicable principle in respect of classification has often been announced. It will suffice to quote a paragraph from Louisville Gas Electric Co. v. Coleman, 277 U.S. 32, 37, 38, 48 S.Ct. 423, 425, 72 L.Ed. 770: `It may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances * * * and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation. * * * It does not, however, forbid classification; and the power of the state to classify for purposes of taxation is of wide range and flexibility, provided always that the classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." * * * That is to say, mere difference is not enough; the attempted classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." * * * Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision. * * *'
"Despite the broad range of the state's discretion, it has a limit which must be maintained if the constitutional safeguard is not to be overthrown. Discriminations are not to be supported by mere fanciful conjecture. Borden's [Farm Products] Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281. They cannot stand as reasonable if they offend the plain standards of common sense." Hartford Steam Boiler Inspection Ins. Co. v. Harrison, 301 U.S. 459, 461, 462, 57 S.Ct. 838, 839, 81 L.Ed. 1223.
The validity of legislative classification depends upon the object and purpose of the law and the legal effect thereof according to the circumstances.
"When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. * * * The principle that the State has a broad discretion in classification, in the exercise of its power of regulation, is constantly recognized by this Court. Still, the statute may show on its face that the classification is arbitrary (Smith v. Cahoon, 283 U.S. 553, 567, 51 S.Ct. 582, 75 L.Ed. 1264) or that may appear by facts admitted or proved. * * * Or, after a full showing of facts, or opportunity to show them, it may be found that the burden of establishing that the classification is without rational basis has not been sustained. * * * But where the legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade *Page 385 
or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and of findings." Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209-910, 55 S.Ct. 187, 192, 79 L.Ed. 281.
This Court has held that the provision that all men are "equal before the law" has been generally interpreted to mean that: "* * * the rights of all persons must rest upon the same rule under similar circumstances and that it applies to the exercise of all the powers of the state which can affect the individual or his property including the power of taxation. It does not however forbid classification and the power of the State to classify for purposes of taxation is of wide range and flexibility, provided always that the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. Mere difference is not enough; the attempted classification must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed and can never be made arbitrarily and without any such basis." State ex rel. Vars v. Knott, 135 Fla. 206, 211, 213, 184 So. 752, 754.
To be "equal before the law" does not preclude the state from resorting to classification, provided the classification is reasonable, not arbitrary, and rests on some ground of difference having a fair and substantial relation to the object of the legislation. The classification, in order to avoid the constitutional mandate, must be founded upon pertinent and rational basis and not upon a capricious and unreasonable basis.
A state may not prohibit and make punishable those who enter into agreements in restraint of trade or which tend to restrict competition and then grant immunity to a class consisting of those who enter into vertical contracts and agreements having the same obnoxious impact upon the public interest. It is the effect of the contract or agreement that is to be considered.
When it is determined that contracts in restraint of trade are injurious and offensive to an interest which the state is entitled to protect, and legislation is enacted to protect that interest, then special privileges or immunities cannot be granted unless the granting of such special privileges and immunities is to serve the public interest or purpose as distinguished from a private interest or purpose.
The special privileges and immunities granted plaintiff-respondent, Ch. 541, supra, under present economic conditions and statutory laws serve a private interest and contravene the constitutional guaranties.
Sections 1 and 12 of the Bill of Rights of the Constitution of Florida (as well as the Fourteenth Amendment to the U.S. Constitution) require that all shall stand "equal before the law" and that "no person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken without just compensation." It seems obvious that such arbitrary selections for legislative favor as are contained in the Fair Trade Act were precisely what the constitutional provisions were designed to prevent.
The legislature has designated selling below the fixed price to be "unfair competition" (Sec. 541.07) for anyone, whether the person "selling is or is not a party to such contract * * *" and "actionable at the suit of any person damaged thereby."
"Equity regards substance rather than form." The mere designation of an act as "unfair competition" does not preclude judicial appraisal, and courts of equity will not be misled by mere devices or baffled by mere forms, but they will disregard names and penetrate disguises of form to discover the substance of an act or transaction. The bill fails to set forth facts sufficient to show unfair competition in fact.
For a court of equity to entertain plaintiff-respondent's bill would be to uphold and honor the special privileges and immunities attempted to be conferred by the statute when generally other acts of like *Page 386 
force and effect are proscribed and made penal.
The writ of certiorari should issue and the order of the chancellor should be quashed.